229 F.3d 448 (4th Cir. 2000)
 DIAMOND HEALTHCARE OF OHIO, INCORPORATED, a Virginia corporation, Plaintiff-Appellant,
v.
HUMILITY OF MARY HEALTH PARTNERS, formerly known as Saint Elizabeth Health Center, d/b/a Saint Elizabeth Health Center, an Ohio nonprofit corporation; HM HEALTH SERVICES, INCORPORATED, an Ohio corporation, Defendants-Appellees.
 No. 00-1006.
 UNITED STATES COURT OF APPEALS, FOR THE FOURTH CIRCUIT.
 June 5, 2000, Argued.
October 5, 2000, Decided.
 
 Judith Bowles Henry, CREWS & HANCOCK, P.L.C., Richmond, Virginia, for Appellant. Quintin F. Lindsmith, BRICKER & ECKLER, L.L.P., Columbus, Ohio, for Appellees. ON BRIEF: Martin A. Donlan, Jr., CREWS & HANCOCK, P.L.C., Richmond, Virginia, for Appellant. Susan C. Armstrong, MAYS & VALENTINE, L.L.P., Richmond, Virginia, for Appellees.
 Before NIEMEYER and LUTTIG, Circuit Judges, and Robert R. BEEZER, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.
 Affirmed by published opinion. Judge NIEMEYER, wrote the opinion, in which Senior Judge BEEEZER joined. Judge LUTTIG wrote a dissenting opinion.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 The question presented on appeal in this breach-of-contract action is whether Humility of Mary Health Partners ("HMH Partners"), an Ohio corporation with its principal place of business in Youngstown, Ohio, is subject to the personal jurisdiction of a federal court sitting in Virginia. Diamond Healthcare of Ohio, Inc. ("Diamond Healthcare"), a Virginia corporation which entered into a contract with HMH Partners, contends that by reason of this contract, HMH Partners subjected itself to personal jurisdiction in Virginia. The district court disagreed and granted HMH Partners' motion, filed under Federal Rule of Civil Procedure 12(b)(2), to dismiss for lack of personal jurisdiction. We affirm.
 
 
 2
 * Diamond Healthcare, which has its principal place of business in Richmond, Virginia, entered into a contract with HMH Partners, dated December 24, 1997. Under the contract, Diamond Healthcare agreed to provide services to HMH Partners in Boardman, Ohio, for the operation of "Project NuStart," a partial-hospitalization program for the elderly. In July 1999, HMH Partners terminated the contract, and Diamond Healthcare filed this action in the district court in Virginia for breach of contract, relying on diversity of citizenship for subject matter jurisdiction. Diamond Healthcare alleged that HMH Partners failed to make its required monthly payments, failed to give 60 days' notice of its termination of the contract, failed to give "notice of a specific alleged breach," and failed to allow Diamond Healthcare an opportunity to cure. It demanded $ 1,364,000 in damages.
 
 
 3
 HMH Partners filed a motion to dismiss the complaint based on lack of personal jurisdiction. It contended that HMH Partners' contacts with Virginia were constitutionally insufficient to subject it to personal jurisdiction in a Virginia court. The parties submitted numerous affidavits, which were not materially in conflict. Based on these affidavits, the district court granted HMH Partners' motion to dismiss, concluding that HMH Partners' contractual relationship with Diamond Healthcare did not create constitutionally sufficient contacts with Virginia to subject it to suit there. It noted that under the contract, Diamond Healthcare agreed to hire staff and run an Ohio partial-hospitalization program serving Ohio patients using Ohio personnel. Even though Diamond Healthcare was a Virginia corporation located in Richmond and would perform its contract under the general supervision of its corporate leadership in Richmond, the court concluded that the contract called for Diamond Healthcare to perform "predominantly in Ohio." The court acknowledged that there were many phone calls, letters, and fax communications between Ohio and Virginia, but concluded that "the vast number of phone calls between Ohio and Richmond appear to have taken place between employees of the Virginia company, not between the companies themselves." Dismissing as constitutionally insufficient the few contractual contacts that HMH Partners did have with Virginia, the court concluded:
 
 
 4
 While the parties here did enter into extended negotiations, the Contract does not require Diamond [Healthcare] to per form its services from Virginia. At most, the Contract . . . appears merely to document the unremarkable notion that a corporation's home office may instruct that corporation's operatives in the field, but this alone does not invest the Court with personal jurisdiction over [HMH Partners]. Nor is it at all clear from its course of dealing with Diamond [Healthcare] that [HMH Partners] could reasonably expect to be haled into court in Virginia, given that the utmost extent of [HMH Partners'] post-negotiation contacts with [Diamond Healthcare's] corporate office appears to be the occasional payment mailed to Richmond. The defendant here did not seek out the forum corporation, it did not anticipate that the forum corporation would provide its services predominantly from the forum, it did not agree to a contract governed by forum law, and its course of performance under the Contract demonstrates that it could not expect to be haled into Court in Virginia.
 
 
 5
 From the district court's opinion dismissing its action, Diamond Healthcare noticed this appeal.
 
 II
 
 6
 Under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. See ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 622 (4th Cir. 1997). And a Virginia court may exercise personal jurisdiction "over a person . . . as to a cause of action arising from the person's . . . transacting any business" in Virginia. Va. Code Ann. 8.01-328.1(A). This statute has been construed to extend personal jurisdiction to the full extent permitted by the Due Process Clause. See English & Smith v. Metzger, 901 F.2d 36, 38 (4th Cir. 1990); Danville Plywood Corp. v. Plain & Fancy Kitchens, Inc., 218 Va. 533, 238 S.E.2d 800, 802 (Va. 1977). Accordingly, we recognize that, in determining the reach of the state's long-arm statute, the statutory and constitutional inquiries coalesce into the question of whether HMH Partners had sufficient minimum contacts with Virginia to satisfy due process requirements. See Stover v. O'Connell Assocs., Inc., 84 F.3d 132, 135-36 (4th Cir. 1996). At bottom, however, the question is a matter of Rule 4 interpretation and not of constitutional magnitude because Congress has authority constitutionally to permit service in federal court beyond any state's boundaries.* See Fed. R. Civ. P. 4(k)(1); ESAB Group, 126 F.3d at 622.
 
 
 7
 Applying the constitutional limitations on state service of process incorporated in Rule 4(k)(1)(A), we understand that when a defendant's contacts with the forum state are continuous and systematic, irrespective of whether the transaction in question had sufficient contacts with the state, a court may exercise general personal jurisdiction over the defendant. See ESAB Group, 126 F.3d at 623-24. In the absence of continuous and systematic contacts, a court may still exercise specific personal jurisdiction when the contacts relate to the cause of action and create a substantial connection with the forum state. See id. at 625.
 
 
 8
 In this case, HMH Partners filed affidavits, which have remained uncontroverted, averring that it has not conducted any business in Virginia; that it owns no property in Virginia; that it has not solicited any business in Virginia; that its employees have not visited Virginia on its behalf to conduct its business; and that it has no Virginia patients. Because HMH Partners' contacts with Virginia have accordingly not been continuous and systematic, the district court could not exercise general personal jurisdiction over HMH Partners. See ESAB Group, 126 F.3d at 623-24. The only potential basis for personal jurisdiction therefore is the contractual relationship between Diamond Healthcare and HMH Partners. The resulting inquiry probes whether, in connection with this contract, HMH Partners had a substantial connection with Virginia such that it "engaged in some activity purposefully directed toward [Virginia]." Id. at 625 (quotation marks and citations omitted). And HMH Partners' actions must have been directed at Virginia "in more than a random, fortuitous, or attenuated way." Id. It is on these criteria that we base our analysis.
 
 III
 
 9
 The contract between Diamond Healthcare and HMH Partners was initiated by Diamond Healthcare, which approached HMH Partners in Ohio to solicit HMH Partners' purchase of Diamond Healthcare's capacity for managing a partial-hospitalization program. During negotiations, representatives of the parties met in Ohio on several occasions, but never in Virginia. They did, however, exchange telephone calls, letters, and faxes between their offices in Ohio and Virginia. Following negotiations, HMH Partners signed the agreement in Ohio and sent it to Richmond, where Diamond Healthcare signed it. Formed in these circumstances, the contract represents the product of HMH Partners' favorable response to Diamond Healthcare's unsolicited invitation for performance of a project in Ohio, which the parties agreed would be regulated under Ohio law, even though some aspects of the contract could be performed in Virginia. See Chung v. NANA Dev. Corp., 783 F.2d 1124, 1128 (4th Cir. 1986) (Alaska defendant lacked minimum contacts with Virginia, even though the contract's "essential terms were negotiated by telephone between Alaska and Virginia," when "those communications were initiated by" the Virginia plaintiff).
 
 
 10
 Not only did Diamond Healthcare initiate the contractual relationship in Ohio, but the resulting agreement contemplated the bulk of the contract's performance at Project NuStart in Boardman, Ohio. Under the contract, Diamond Healthcare was responsible for employing directors "to provide overall management and services" at Project NuStart, for furnishing "sufficient staff at all times to operate a quality program," for developing "job descriptions for the personnel to be employed by" Diamond Healthcare at Project NuStart, for "recruiting, orienting, training and supervising the personnel to be employed by" Diamond Healthcare at Project NuStart, and for recruiting psychiatrists "to become members of the Medical Staff of" Project NuStart. In addition to running Project NuStart in Ohio, Diamond Healthcare did agree that it would "provide consultation from its corporate office [in Richmond] as reasonably necessary in the areas of finance, program development and operations, personnel and labor relations, professional staff relations, recruiting, licensure, and survey compliance."
 
 
 11
 While the principal part of Diamond Healthcare's performance was required in Boardman, Ohio, virtually all of HMH Partners' performance was required there. It agreed to provide the "services necessary for the operation" of Project NuStart, including the provision of equipment, supplies, and hospital support personnel. HMH Partners was obliged also to review and approve staff provided by Diamond Healthcare at the facility, to obtain necessary licenses and accreditation, and to regulate the admission of patients. As part of the financial arrangements between the parties, HMH Partners was required to mail to Diamond Healthcare in Richmond certain financial information about Project NuStart and its monthly management fees.
 
 
 12
 The fact that the contract called for the obligations of both parties to be performed mainly in Ohio and to be governed by Ohio law is inconsistent with Diamond Healthcare's assertion that HMH Partners invoked the "benefits and protections" of Virginia law, Hanson v. Denckla, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958), and with its contention that HMH Partners could "reasonably anticipate being haled into court" in Virginia, World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 481, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985) ("The Court of Appeals gave insufficient weight to provisions in the various [contract] documents providing that all disputes would be governed by [the forum state's] law"). These factors undercut Diamond Healthcare's argument that HMH Partners deliberately exercised the privilege of undertaking contractual activity in Virginia. See Hanson, 357 U.S. at 252; cf. Burger King, 471 U.S. at 482 (noting that foreign defendant "purposefully availed himself of the benefits and protections of [the forum state's] laws by entering into contracts expressly providing that those laws would govern franchise disputes" (quotation marks omitted)).
 
 
 13
 While some acts required of and performed by HMH Partners necessitated its contact with Virginia--HMH Partners had to keep Diamond Healthcare advised of legal or regulatory action taken against Project NuStart and any denial of payment from a payer source, and it also had to send monthly payments to Richmond-these requirements were incidental to HMH Partners' role under the contract. With Diamond Healthcare's assistance, HMH Partners agreed to provide partial-hospitalization services in Boardman, Ohio; ancillary and isolated notifications and mailings to Richmond amounted only to "attenuated contact" with Virginia. Chung, 783 F.2d at 1128; see also Stover, 84 F.3d at 136.
 
 
 14
 Diamond Healthcare places heavy emphasis on the nature and extent of its own activities in Virginia, arguing that these activities should be imputed to HMH Partners by reason of the contractual relationship between the parties. But development of this argument can only lead to the conclusion that Diamond Healthcare directed its activities under the contract toward Ohio, not that HMH Partners directed its activities toward Virginia. See Hanson, 357 U.S. at 251-52; Stover, 84 F.3d at 136; cf. Burger King, 471 U.S. at 480 (jurisdiction existed in Florida where Michigan defendant entered "a carefully structured 20-year relationship that envisioned continuing and widereaching contacts with [the plaintiff] in Florida," including "long-term and exacting regulation of [the defendant's] business from [the plaintiff's] Miami headquarters").
 
 
 15
 Finally, Diamond Healthcare emphasizes the frequent communications and management activities between its Virginia office and Project NuStart in Boardman, Ohio. But these communications and management activities were principally between Diamond Healthcare's employees in Richmond and its own employees at Project NuStart, for Project NuStart was developed, managed, and staffed by Diamond Healthcare, and Project NuStart personnel were responsible for virtually every aspect of its day-to-day operation. Diamond Healthcare provides no authority for the proposition that interactions between its headquarters and its own employees in the field, across state lines, may form a "sufficiently substantial" connection with an out-of-state entity with which those employees are contractually affiliated. Chung, 783 F.2d at 1126. Such contact represents unilateral activity by Diamond Healthcare that does not create personal jurisdiction over HMH Partners. See Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 417, 80 L. Ed. 2d 404, 104 S. Ct. 1868, (1984); Hanson, 357 U.S. at 253 ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State"); Cancun Adventure Tours, Inc. v. Underwater Designer Co., 862 F.2d 1044, 1046-47 (4th Cir. 1988).
 
 
 16
 Accordingly, we affirm the judgment of the district court.
 
 AFFIRMED
 
 
 Notes:
 
 
 *
 Of course, a state's exercise of long-arm jurisdiction remains limited by the extent of its sovereignty and the protection of the Due Process Clause of the Fourteenth Amendment. See Stover, 84 F.3d at 136.
 
 
 LUTTIG, Circuit Judge, dissenting:
 
 17
 I believe that the Supreme Court's decision in Burger King v. Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985), is both legally and factually indistinguishable in any material respect from the instant case and dictates a finding that jurisdiction over this dispute between HMH Partners and Diamond Healthcare unmistakably lies in the federal courts of Virginia, even if jurisdiction would also lie in the federal courts of Ohio.
 
 
 18
 Not only does the majority's holding directly conflict with the Supreme Court's decision in Burger King, it also directly conflicts with our own precedent in English & Smith v. Metzger, 901 F.2d 36 (4th Cir. 1990). There, in a case involving contacts no more significant than those present in the instant case, we flatly rejected on the authority of Burger King the defendant's claim, which mirrored the claim made by HMH Partners here, that Virginia lacked jurisdiction because "he conducted his business [with plaintiff] solely by phone and through the mails, and because he had no expectation that [plaintiff] would do the work in Virginia." 901 F.2d at 39. Our holding, of course, was wholly unsurprising. For, as has always been the case, the "relevant question is not where the contacts predominate, but only whether enough minimum contacts exist that the district court's assumption of specific jurisdiction satisfies due process." Id. (emphasis added).
 
 
 19
 Here, HMH Partners, an Ohio corporation, purposely availed itself of the privilege of doing business in the forum state of Virginia by virtue of its deliberate, reciprocal, continuing contract obligations to Diamond Healthcare, a Virginia corporation, and the connections between that contract and Virginia. Under Burger King and English & Smith, such a relationship between the parties and the forum easily constitutes sufficient minimum contact to make it "presumptively not unreasonable to require [the out-of-state corporation] to submit to the burdens of litigation" in the forum state. Burger King, 471 U.S. at 476. As the Court explained in Burger King, where a defendant purposely avails itself "by some act . . . of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws," it should "reasonably anticipate out-of-state litigation." Id. at 475 (citing Hanson v. Denckla, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1953)). Due process requires no more.
 
 
 20
 Although the majority perfunctorily acknowledges that the controlling question is whether sufficient minimum contacts with Virginia exist to satisfy due process, see ante 450-51, I believe that it is ultimately the majority's failure first, to appreciate, and then, for purposes of its analysis, actually to draw, the distinction between "minimum" and "predominant" contacts, that leads it to conclude in error that jurisdiction over this dispute can lie only in Ohio. An understanding of this distinction is critical if one is not to confuse the due process inquiry of specific jurisdiction with a conflict of laws inquiry of the kind that the majority essentially undertakes. As if "predominance" of contacts were the relevant inquiry, throughout its opinion the majority repeatedly emphasizes, for example, that the parties performed "mainly" in Ohio, ante at 451-52; that the contract was "predominantly" performed there, id. at 449-50; and that it was contemplated that the "bulk of the contract's performance" would occur in that state, id. at 451-52. And, tellingly, without so much as a suggestion of any difference between its holding and that of the district court, the majority summarizes the judgment that it affirms as follows: "Even though Diamond Healthcare was a Virginia corporation located in Richmond and would perform its contract under the general supervision of its corporate leadership in Richmond, the [district] court concluded that the contract called for Diamond Healthcare to perform 'predominantly in Ohio.'" Ante, at 449; see also id. at 450 (quoting district court opinion that "the defendant did not anticipate that the forum corporation would provide its services predominantly from the forum"). The only other possible source of the majority's error that I can conceive is a belief that jurisdiction can lie in but one jurisdiction. This belief, however, is no less foreclosed by Supreme Court caselaw than that on which I suspect the majority has in error ultimately proceeded.
 
 
 21
 Accordingly, on the strength of the Supreme Court's decision in Burger King alone--an authority barely even cited by the majority, see ante at 452, and never discussed at all-- but certainly on the combined strength of that decision and our own Circuit's decision in English & Smith, I would hold that a federal court may exercise jurisdiction in Virginia over HMH Partners with respect to an action arising from its contract with Diamond Healthcare.
 
 
 22
 Turning to Burger King, at issue in that case was whether there were sufficient minimum contacts with the state of Florida to support jurisdiction over a contract dispute between Burger King, a Florida corporation, as franchisor, and Rudzewicz, a Michigan resident with no physical ties to Florida, as franchisee. Rudzewicz's franchise operated solely in Michigan and sold food products only to Michigan residents, and the franchise agreement contemplated the bulk of performance in Michigan. Notwithstanding, the Court held that, based on the contract and the parties' contract performance, Rudzewicz had both "established a substantial and continuing relationship with Burger King's Miami headquarters" and "received fair notice from the contract documents and the course of dealing that he might be subject to suit in Florida." Burger King, 471 U.S. at 487.
 
 
 23
 A comparison of Rudzewicz's contacts with Florida, which the Supreme Court held in Burger King were more than sufficient to support federal jurisdiction in that state, and HMH Partners' contacts with Virginia, confirms beyond any question that jurisdiction in this case lies in the federal courts of the Commonwealth.
 
 
 24
 First, in Burger King, Rudzewicz "eschew[ed] the option of operating an independent local enterprise, [and] deliberately '[reached] out beyond' Michigan and negotiated with a Florida corporation." 471 U.S. at 480. As the Court observed, focusing on the fact of purposeful affiliation rather than on which party initiated the contract, "Rudzewicz most certainly knew that he was affiliating himself with an enterprise based primarily in Florida." Id. at 481.
 
 
 25
 As, in Burger King, Rudzewicz deliberately affiliated with a foreign corporation in the forum state (Florida), so also in this case did HMH Partners deliberately affiliate with a foreign corporation in the forum state (Virginia). Regardless of who initiated the contact between the two parties, it is undisputed that HMH Partners was well aware that Diamond Healthcare was a Virginia corporation. HMH Partners requested an acquisition proposal from Diamond Healthcare's Virginia Headquarters, conducted extensive negotiations between Ohio and Virginia over an eleven-month period, and mailed the contract at issue into Virginia for Diamond Healthcare's signature. J.A. 54, 88, 94.
 
 
 26
 Second, in Burger King, Rudzewicz not only chose to do business with a corporation located outside of Michigan, but he also negotiated with the Florida corporation for "a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization," 471 U.S. at 480-81, evidencing the antithesis of random, fortuitous, or attenuated contacts that have historically given rise to due process concerns. Id. at 475.
 
 
 27
 As, in Burger King, Rudzewicz reached out for a franchise agreement with a national franchisor located outside his home state, so also here did HMH Partners reach out for a four-year contract with an out-of-state corporation, Diamond Healthcare, "one of the larger behavioral health management companies in the country." J.A. 87.
 
 
 28
 This conduct by HMH Partners in not only reaching out to a foreign corporation, but reaching out for the express purpose of entering into and engaging in a long-term business relationship, is anything but "unilateral activity" of another party or a third person, ante, 452--at least as that phrase has heretofore been understood by either the Supreme Court or our court. And it is far removed from the "unilateral activity of those who claim some relationship with a nonresident defendant," which the Court in Burger King described as insufficient to establish the minimum contact necessary to support specific jurisdiction against constitutional attack. See Burger King, 471 U.S. at 476 n.17.
 
 
 29
 Third, in Burger King, Rudzewicz contractually bound his franchise to "exacting regulation of virtually every conceivable aspect of [his] operations" by Burger King's Miami, Florida, headquarters. 471 U.S. at 465 & n.4.
 
 
 30
 As, in Burger King, Rudzewicz contracted for exacting regulation by personnel in Florida, so also here, HMH Partners consented to extensive regulation of its business by Diamond Healthcare's personnel in Virginia. The contract between HMH Partners and Diamond Healthcare provided that Diamond Healthcare was to develop, implement, and maintain policies and procedures to govern virtually every conceivable aspect of HMH Partners' NuStart Program. J.A. 58-60. It specifically provided that Diamond Healthcare would "provide consultation . . . as reasonably necessary in the areas of finance, program development and operations, personnel and labor relations, professional staff relations, recruiting, licensure, and survey compliance." J.A. 61. And it required HMH Partners to provide Diamond Healthcare with monthly financial information, and to notify Diamond Healthcare ". . . of [any and all] legal or governmental action." J.A. 62-63, 67, 69.
 
 
 31
 Fourth, in Burger King, although, under Burger King's two-tiered administrative structure, day-to-day monitoring of Rudzewicz's Michigan franchise took place from Burger King's Michigan district office, policy was set in Miami, district offices reported to Miami, and "the parties' course of dealing repeatedly confirmed that decision-making authority was vested in the Miami headquarters." 471 U.S. at 481.
 
 
 32
 As, in Burger King, issues raised at the district office in Michigan were forwarded to, and resolved in Florida, so also here were issues raised in Diamond Healthcare's Ohio offices forwarded to, and resolved in, Virginia. Under Diamond Healthcare's like two-tier administrative structure, although day-to-day monitoring and operation of the partial hospitalization program was undertaken by the local program staff in Ohio, "it was a key term of the contract that local program staff [in Ohio] be managed by Diamond Healthcare's senior managers in Virginia." J.A. 55 (testimony of HMH Partners' Chief Operating Officer). Indeed, by contract, Diamond Healthcare actually "was to provide management consultation to the NuStart partial hospitalization program from its [Richmond] corporate office." J.A. 54, 61; see also id. at 61 (providing, by contract, that Diamond Healthcare would "provide consultation from its corporate offices [in Richmond] as reasonably necessary in the areas of finance, program development and operations, personnel and labor relations, professional staff relations, recruiting, licensure, and survey compliance").
 
 
 33
 And, from negotiation through performance, HMH Partners acted in conformance with this understanding that decisions would be made in, and management would emanate from, the Commonwealth. In the course of contract negotiations, HMH Partners communicated by mail and telephone with Diamond Healthcare's Virginia headquarters. J.A. 54-55, 88, 92. These communications continued over the course of contract performance. HMH Partners even terminated the Management Agreement with Diamond Healthcare by letter sent to Virginia, and the parties' negotiations relating to this dispute took place via telephone and correspondence between Ohio and Virginia. J.A. 92.
 
 
 34
 Fifth, in Burger King, the franchise contract between Rudzewicz and Burger King called for "payment of all required fees and forwarding of all relevant notices to the Miami headquarters." 471 U.S. at 466, 480.
 
 
 35
 As, in Burger King, all payments were to be forwarded to the forum state of Florida, so also here, during the term of contract performance, HMH Partners was required to, and did, mail all management fees to Diamond Healthcare in Virginia. J.A. 91.
 
 
 36
 Sixth, in Burger King, "Rudzewicz's refusal to make contractually required payments in Miami . . . caused foreseeable injuries to the corporation in Florida." 471 U.S. at 480.
 
 
 37
 As, in Burger King, foreseeable injuries occurred in the forum state of Florida, so also here did HMH Partners' alleged failure to make contractually required payments in Virginia, and termination of its contract with Diamond without proper notice, cause foreseeable injury to Diamond Healthcare in Virginia.
 
 
 38
 Finally, in Burger King, although there was a choice-of-law provision in the contract between the franchisor and the franchisee, there was an absence of a contractually-designated dispute resolution forum, which, as the Court noted, by negative implication places the parties on notice that suit could be filed in the jurisdiction of either party to the contract. 471 U.S. at 482 n.24.
 
 
 39
 And as, in Burger King, there was no forum selection provision in the parties' contract, so also here, although HMH Partners and Diamond Healthcare contracted for a choice of law, there was no forum selection provision included in their contract. Significantly, in fact, HMH Partners' own Chief Operating Officer even recognized the significance of such an intentional omission:
 
 
 40
 It was my understanding that termination of the Management Agreement might lead to litigation with Diamond Healthcare that Diamond Healthcare might bring in Virginia because, while we had negotiated a choice of law clause under the Management Agreement, we had not negotiated a choice of forum clause limiting litigation to courts in Ohio.
 
 
 41
 J.A. 56 (affidavit of Norman F. Gruber).
 
 
 42
 Given the almost uncanny parallels between the contacts between Rudzewicz and the forum state of Florida, which the Supreme Court held in Burger King gave rise to jurisdiction in Florida, and the contacts between HMH Partners and the forum state of Virginia in this case, I have no question at all that a federal court sitting in Virginia may, consistent with the minimum requirements of due process, exercise jurisdiction over HMH Partners in this dispute related to its longterm contract with Diamond Healthcare. If Burger King instructs us as to anything, it is that a defendant who seeks and enters into an interstate contract with a national corporation that is to be performed by the plaintiff in substantial part from out of state; who,by contract, is regulated and directed by the plaintiff from out of state; and, who, pursuant to contract, directs communications, payments, and other information to the plaintiff's headquarters out of state, cannot then contest an assertion of jurisdiction by the out-of-state forum on the ground that that forum lacks, as a matter of constitutional due process, the very minimum of contacts necessary to support personal jurisdiction.
 
 
 43
 If I had any doubt as to this conclusion--and, frankly, I have none--I would think this conclusion inescapable upon consideration of the further factors of Virginia's manifest interest "in providing its residents with a convenient forum for redressing injuries inflicted by out-of-town actors"; the interest in keeping due process from transforming itself into "a territorial shield to avoid interstate obligations that have been voluntarily assumed"; and, the lesser burdens imposed by out-of-state suits, given the realities of modern transportation and communications. Burger King, 471 U.S. at 473-74 (citations omitted).
 
 
 44
 As the Supreme Court observed in Burger King with respect to an interstate contract, a party that creates "'continuing relationships and obligations with citizens of another state'" is conducting activities within the forum state; as a consequence, the party is "subject to regulation and sanctions in the other State for the consequences of [its] activities." Burger King, 471 U.S. at 473 (citing Travelers Health Assn. v. Virginia, 339 U.S. 643, 647, 94 L. Ed. 1154, 70 S. Ct. 927 (1950)). See also McGee v. International Insurance Co., 355 U.S. 220, 222-23, 2 L. Ed. 2d 223, 78 S. Ct. 199 (1957). Under such circumstances a defendant "manifestly has availed [itself] of the privilege of conducting business [in the forum state], and because [its] activities are shielded by the 'benefits and protections' of the forum's laws," it is not unreasonable, let alone unconstitutional, to subject it to suit there as well. Burger King, 471 U.S. at 476.
 
 
 45
 Because I believe that the district court erred in dismissing Diamond Healthcare's suit against HMH Partners for lack of minimum contacts with the forum state of Virginia, I respectfully dissent from this court's affirmance of the district court's judgment.