Lawrence D'ADDARIO, suing individually and on behalf of all others similarly situated, and derivatively on behalf of RMS Titanic, Inc., Plaintiff,

v.

Arnie GELLER, G. Michael Harris, Joe Marsh, Gerald Couture, Nick N. Cretan, Doug Banker, and RMS Titanic, Inc., Defendants.

No. 2:02CV250.

United States District Court, E.D. Virginia. Norfolk Division.

April 8, 2003.

Steven G. Storch, Marianne R. Merritt, Storch Amini & Munves, P.C., New York City, NY, William R. O'Brien, Brydges, O'Brien & Frucci, PC, Virginia Beach, VA, Counsel for plaintiff.

John D. Padgett, McGuire, Woods, LLP, Norfolk, VA, Counsel for Geller, Couture, Cretan, Banker, and RMS TITANIC.

G. Michael Harris, Belleair, FL, Pro Se Defendant.

James L. Chapman, IV, Crenshaw, Ware & Martin, PCL, Norfolk, VA, H. Yale Gutnick, Strassburger, McKenna, Gutnick & Potter, Pittsburg, PA, Counsel for Marsh.

## *OPINION*

REBECCA BEACH SMITH, District Judge.

This matter comes before the court on defendants' various motions to dismiss for lack of personal jurisdiction, improper venue, failure to make a demand on the Board of Directors of RMS Titanic, Inc. ("RMST"), and failure to state a claim upon which relief may be granted. All defendants also seek a transfer of venue to another district, absent dismissal of the case.

### I. *Factual and Procedural History*

Defendant RMST is a Florida corporation with its principal place of business in Atlanta, Georgia. Pursuant to an order entered by this court, RMST is the sole salvor-in-possession of the submerged wreck and wreck site of the historic ship-wreck TITANIC, which is located approximately 400 miles off the coast of Newfoundland. *See R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel,* No. 2:93cv902 (E.D. Va. June 7, 1994) (order

granting sole salvor-in-possession rights) [hereinafter case referred to as "Action No. 2:93cv902"]. The wreck was discovered in international waters in 1985 by a joint American–French expedition. In 1987, a limited partnership named Titanic Ventures conducted an expedition and recovered approximately 1,800 artifacts. Titanic Ventures later sold its interests in the salvage operations, and the artifacts, to RMST. In 1993, RMST commenced an *in rem* action in this court against the TITANIC to become its salvor-in-possession. *See* Action No. 2:93cv902. All parties agree that RMST is subject to personal jurisdiction in this judicial district.

Defendant Arnie Geller is RMST's President, Chief Executive Officer ("CEO"), and a Director; he resides in Georgia. Defendant Gerald Couture is RMST's Vice–President, the Chief Financial Officer, and a Director. He resides in Florida. Defendant Nick N. Cretan is a Director of RMST and resides in New York. Defendant Doug Banker is also a Director of the corporation; he resides in Michigan.

Defendant G. Michael Harris was formerly the Executive Vice President, Chief Operating Officer, and a Director of RMST. His positions as Executive Vice President and Chief Operating Officer were terminated in the summer of 2000, after he led the 2000 expedition to the TITANIC. He was terminated as a Director in or shortly after September of 2000. He resides in Florida. Defendant Joe Marsh resides in Ohio and owns between 11% and 19% of the company's outstanding shares. Although Marsh is not a member of RMST's Board of Directors, plaintiff contends that Marsh is an "insider" who controls or colludes with Geller in making RMST's business management decisions.

In November of 1999, defendants Geller, Harris, and Marsh were instrumental in the hostile takeover of former RMST management. Plaintiff complains that RMST's new management has engaged in a scheme to loot the corporation, including "fraud, self-dealing, mismanagement, diversion and waste of corporate assets." Compl. ¶ 1. Plaintiff alleges that defendants Geller, Harris, and Marsh engaged in mail fraud and obstruction of justice in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). He also seeks to recover damages from a wrongful denial of shareholders' voters' and dissenters' rights under Florida statutory law regarding the hostile takeover of RMST in November of 1999. Finally, he seeks to disgorge profits realized by defendant Marsh, who allegedly engaged in "insider trading" between December 2000 and January 2001.

Plaintiff filed this shareholder derivative suit on April 15, 2002, on behalf of similarly-situated shareholders and derivatively on behalf of RMST. Subject matter jurisdiction is based on 28 U.S.C. § 1331 (federal question jurisdiction), as plaintiff has alleged violations of 18 U.S.C. § 1962(c) (RICO) and 15 U.S.C. § 78aa (Securities Exchange Act of 1934). Subject matter jurisdiction is also based on diversity of citizenship, 28 U.S.C. § 1332. Plaintiff alleges the amount in controversy is greater than $75,000.

Defendants filed motions to dismiss, plaintiff filed memoranda in opposition, and defendants filed reply briefs.[1] Be-

---

1. Defendant Harris filed a motion to dismiss on May 23, 2002. Plaintiff opposed Harris' motion by memorandum filed June 14, 2002. Defendant Marsh filed his motion to dismiss on June 20, 2002. Defendants Geller, Cou-

ture, Cretan, Banker, and RMST [hereinafter "the Geller defendants"] also filed their motion to dismiss on June 20, 2002. Plaintiff opposed the motions of Marsh and the Geller defendants by memorandum filed July 2,

cause all the individual defendants asserted lack of personal jurisdiction, by order filed July 10, 2002, the court permitted plaintiff to conduct limited discovery on the issue of personal jurisdiction. On September 23, 2002, after limited discovery was conducted, plaintiff filed a supplemental memorandum in opposition to all the defendants' motions to dismiss for lack of personal jurisdiction. By motion filed September 26, 2002, plaintiff requested leave to file a sur-reply in response to defendants' then-forthcoming supplemental briefs.[2] By motion filed September 20, 2002, plaintiff requested a preliminary injunction to prevent RMST from relinquishing its salvor-in-possession status in the salvage action.[3]

On October 7, 2002, Harris, Marsh, and the Geller defendants submitted supplemental memoranda in support of their respective motions to dismiss. By order entered October 15, 2002, after the defendants expressed no objection thereto, the court granted plaintiff leave to file a sur-reply pleading. To date, plaintiff has not filed a sur-reply. On December 11, 2002, the court heard oral argument on the various motions to dismiss. Defendant Harris, *pro se*, elected not to appear and relied on the arguments of other parties to the extent those arguments were applicable to him. All parties have had a full opportunity to present their arguments; therefore, this matter is ready for judicial determination.

## II. Personal Jurisdiction

 All defendants, except RMST, have moved to dismiss the case under Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction. Plaintiff bears the burden of establishing the existence of personal jurisdiction by a preponderance of the evidence, *Mylan Labs., Inc. v. Akzo,* 2 F.3d 56, 59–60 (4th Cir.1993), but he is entitled "to favorable inferences from the pleadings, affidavits, and documents submitted on the issue." *Reynolds Metals Co. v. FMALI, Inc.,* 862 F.Supp. 1496, 1498 (E.D.Va.1994) (citations omitted). Under Rules 4(k)(1)(A) and (D) of the Federal Rules of Civil Procedure, a federal court may base its exercise of power over a defendant's person in the manner provided by state law, *see ESAB Group,*

2002. The Geller defendants filed their reply on July 9, 2002. Defendant Marsh filed his reply to plaintiff's opposition on July 10, 2002.

2. This request was related to the salvage action, Action No. 2:93cv902. RMST filed its Supplemental Periodic Report on September 24, 2002, announcing the company's intent to relinquish salvor-in-possession status. Plaintiff believed the report was purposely filed the day after he filed his supplemental memorandum to prevent him from addressing the latest actions of RMST's directors.

3. On October 15, 2002, the Geller defendants opposed plaintiff's motion for a preliminary injunction. As a threshold matter, the court notes that plaintiff's motion for a preliminary injunction to enjoin RMST from relinquishing its salvor-in-possession status is now moot by actions in the salvage action. By letter dated November 4, 2002, RMST's counsel in Action No. 2:93cv902 informed the court that RMST intends to seek shareholder approval regarding the proposed voluntary relinquishment of salvor-in-possession status and to follow the relevant statutory procedures that apply when a Florida corporation intends to dispose of all or substantially all of its corporate assets. RMST's counsel affirmed that intent at a status hearing before the court on November 25, 2002. *See* Action No. 2:93cv902, Tr. of Hearing, Nov. 25, 2002, at 3. The shareholder meeting was scheduled to occur on February 5, 2003. *Id.* For reasons unrelated to this litigation, the shareholder meeting was postponed indefinitely. *See* Action No. 2:93cv902, Letter of Jan. 24, 2003, from Mark Davis to the court. Counsel for RMST has assured the court that it will be notified of the outcome of the shareholder vote within fourteen days of the shareholder meeting. *Id.*

*Inc. v. Centricut, Inc.,* 126 F.3d 617, 622 (4th Cir.1997), or when otherwise authorized by federal statute. In this case, plaintiff both contends that Virginia's long-arm statute authorizes personal jurisdiction and that nationwide service of process is proper, based on civil RICO claims against defendants Geller, Harris, and Marsh. In addition, plaintiff alleges Securities Exchange Act violations against defendant Marsh. The court will first address Virginia's long-arm statute before turning to these potential federal bases for personal jurisdiction.

## A. *Virginia's Long–Arm Statute*

Rule 4(k)(1)(A) permits a federal court to base its exercise of power over a defendant's person in the same manner as the forum's state courts. For state courts to possess personal jurisdiction over a defendant, a state statute must confer jurisdiction, and the exercise of jurisdiction must be consistent with the due process requirements of the Fourteenth Amendment.

■ In the case *sub judice,* plaintiff is proceeding under the Virginia long-arm statute, Virginia Code § 8.01–328.1 (2002). The Fourth Circuit has laid out the analysis that courts should apply when determining whether personal jurisdiction can be obtained pursuant to a long-arm statute. *See, e.g., Holland v. Hay,* 840 F.Supp. 1091, 1095 (E.D.Va.1994) (citing *English & Smith v. Metzger,* 901 F.2d 36, 38 (4th Cir.1990)). The court must first "determine whether the statutory language applies to [each] defendant; second, if the statutory language applies, [the court] must determine whether the statutory assertion is consistent with the due process clause of the Constitution." *Id.* (quoting *Metzger,* 901 F.2d at 38). Because the Virginia long-arm statute extends the amenability of a non-resident to jurisdiction to the outer perimeter allowed

by the Due Process Clause, the statutory and constitutional inquiries merge into the question of whether the individual defendants had sufficient minimum contacts with Virginia to satisfy due process. *See Metzger,* 901 F.2d at 38 (explaining that the Virginia long-arm statute is co-extensive with the full reach of the Due Process Clause); *see also Stover v. O'Connell Assocs., Inc.,* 84 F.3d 132, 135–36 (4th Cir. 1996) (same with respect to Maryland's long-arm statute); *Columbia Briargate Co. v. First Nat'l Bank,* 713 F.2d 1052, 1057 (4th Cir.1983) (same with respect to South Carolina's long-arm statute).

## 1. *Applicability of Statutory Language*

Virginia Code § 8.01–328.1 sets forth,

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:

1. Transacting any business in this Commonwealth;

2. Contracting to supply services or things in this Commonwealth;

3. Causing tortious injury by an act or omission in this Commonwealth;

4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth.

■ In determining whether the Virginia long-arm statute permits jurisdiction, the court must examine both the quantity and quality of the defendants' contacts with Virginia. *Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.,* 761 F.Supp. 423, 426 (E.D.Va.1991). When a person maintains systematic and continuous contacts with the forum state, the

court could exercise general personal jurisdiction over him for acts committed both within and without the forum. *See Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 450 (4th Cir.2000). "In the absence of continuous and systematic contacts, a court may still exercise specific personal jurisdiction when the contacts relate to the cause of action and create a substantial connection with the forum state." *Id.* The Virginia long-arm statute is a single act statute that can confer specific jurisdiction for "a single act by a nonresident which amounts to 'transacting business' in Virginia and gives rise to a cause of action." *Metzger*, 901 F.2d at 38 (citations omitted).

In determining whether the statutory language applies to each of the individual defendants, the court has been mindful of plaintiff's allegations that all of the individual defendants are engaged in a scheme to loot RMST and thereby defraud the corporation's shareholders. Part and parcel of this scheme was the need to conceal the alleged looting and self-dealing from RMST's shareholders and from this court so that the alleged looting could continue. Naturally, RMST's status as sole salvor-in-possession of the wreck of the TITANIC could have been jeopardized if the court were aware of the alleged scheme to loot RMST. Plaintiff contends that defendants made deliberate misrepresentations to this court about their intentions regarding the management of the corporation, including their intent to sell artifacts. *See* Compl. ¶ 34. Plaintiff also alleges that defendants filed false progress reports with this court in the salvage action. *Id.*[4]

These specific contacts with Virginia relate to causes of action pled in the complaint and create a substantial connection with the forum state. It appears clear to this court that defendants' conduct falls within the reach of Virginia's long-arm statute. The alleged misrepresentations and false reports submitted to this court by current and former management are acts done in Virginia causing tortious injury under Virginia Code § 8.01–328.1(A)(3). In addition, all of the defendants were allegedly engaged in a scheme to loot the corporation and defraud the shareholders.[5] The totality of this alleged scheme, regardless of where the acts furthering the scheme occurred, causes tortious injury in Virginia to RMST's shareholders under Virginia Code § 8.01–328.1(A)(4), in that this federal court in Virginia oversees RMST's fitness to continue its status as sole salvor, which is the corporation's most valuable asset.[6] The defendants have engaged in a persistent course of conduct with regard to RMST's salvor-in-possession status in this forum, as required by that provision. Finally, the alleged misrepresentation and filing of false reports by current and former management can be viewed as transacting business in Virginia pursuant to Virginia Code § 8.01–328.1(A)(1), as these defendants may have been using RMST's business as salvor of the TITANIC to further their personal ends.[7] Accordingly, these contacts justify

4. Plaintiff also cites defendants' plans to make a "surgical incision" in the hull of the ship and alleges defendants detached items from the wreck, even after this court specifically ordered them not to do so.

5. Although defendant Marsh is a stockholder, and not formally part of the current or former management of RMST, he is a party to the alleged scheme to loot and defraud other stockholders.

6. RMST's salvor-in-possession status not only allows the corporation to conduct salvage but also allows it to exhibit artifacts, which is the corporation's main source of revenue.

7. RMST's website still touts that it continues to conduct salvage of the wreck site and "is

the exercise of specific personal jurisdiction over the defendants under section 8.01–328.1(A)(1), (3), and (4) of Virginia's long-arm statute.

### 2. Satisfaction of Due Process

In order for a court's exercise of jurisdiction to satisfy due process requirements, a non-resident defendant must have sufficient "minimum contacts" with the forum state, such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted).

> In applying this standard, the constitutional benchmark is 'whether the defendant purposefully established minimum contacts in the forum State.' *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (internal quotes omitted). Furthermore, a defendant should be able to anticipate being brought to court in the forum, in that contacts 'must be directed at the forum state in more than a random, fortuitous, or attenuated way.' [Citations omitted.] In essence, a defendant must have minimum contacts with the forum state, and a court's exercise of jurisdiction must be reasonable.

*ePlus Tech., Inc. v. Aboud,* 313 F.3d 166, 176–77 (4th Cir.2002). Due process is satisfied when a non-resident "defendant purposefully avails [himself] of the privilege of conducting activities within the forum

State," *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), such that, by that act he "has clear notice that [he] is subject to suit there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

Defendants Geller, Couture, Cretan, Banker, and Harris ("current and former management") argue that, pursuant to the so-called "fiduciary shield doctrine," those contacts with Virginia that were made in their corporate capacities may not be used by this court in ascertaining the propriety of personal jurisdiction over current and former management. *See generally Columbia Briargate,* 713 F.2d 1052.[8]

The relevant inquiry under United States Supreme Court precedent is not whether the individual acted in his corporate capacity or in his personal capacity. *See Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (noting that defendants' "status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually."). Rather, "the controlling issue is simply whether the non-resident defendant, whatever role he may have occupied, had such 'minimum contacts.'" *Columbia Briargate,* 713 F.2d at 1058.

A corporate agent is not subject to personal jurisdiction in his individual capacity under the long-arm statute

---

also engaged in the business of exhibiting the artifacts recovered from the Titanic wreck site." RMS Titanic, Inc., *Corporate Profile, at* http://www.titanic-online.com/rmst/rms_corp .htm (last visited Mar. 31, 2003). The defendants' management of the corporation, including contacts with Virginia, now threatens that very purpose.

**8.** The court directs the Geller defendants to the Fourth Circuit's explanation in *Columbia*

*Briargate:* "[The defendant] committed the alleged tort within the forum state and it is unimportant in those circumstances whether he was acting at the time in his corporate or personal role." 713 F.2d at 1065. The Fourth Circuit focused on sound due process principles rather then viewing as determinative the specific position the individual held. *Id.*

solely based upon his status as a corporate officer or agent. As the Fourth Circuit explained in *Columbia Briargate:*

> [I]f the claim against the corporate agent rests *on nothing more* than that he is an officer or employee of the nonresident corporation and if any connection he had with the commission of the tort occurred without the forum state, ... under sound due process principles, the nexus between the corporate agent and the forum state is too tenuous to support jurisdiction over the agent personally by reason of service under the long-arm statute of the forum state.

*Id.* at 1064–65 (emphasis added).[9] However, a corporate agent *"is* properly subject to the jurisdiction of the forum court" if he committed a tort in his corporate capacity in the forum state and service is made upon him under the forum state's long-arm statute. *Id.* at 1064 (emphasis added). In this case, the claim against defendants rests on much more than that they are RMST's corporate agents. The very essence of the current lawsuit is that the defendants allegedly committed acts under the guise of acting on behalf of and for the benefit of the corporation, when, in point of fact, the acts were allegedly for personal gain. In such a situation, the defendants cannot hide behind a "fiduciary shield" to avoid personal jurisdiction.

A recent Fourth Circuit decision explains:

> In the typical case, the contacts of a company are not attributed to a corporate agent for jurisdictional purposes. *See Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)

(holding that employees' 'contacts with [the forum] are not to be judged according to their employer's activities there'). On the other hand, [a defendant] is not immune from jurisdiction in Virginia merely because her contacts with the Commonwealth were made ostensibly on behalf of [the corporation]. *Id.* (noting that employees' 'status as employees does not somehow insulate them from jurisdiction'). Therefore, the court's exercise of jurisdiction was proper if [the defendant] had sufficient contacts with Virginia, even if those contacts were made ostensibly on behalf of [the corporation].

*ePlus Tech.,* 313 F.3d at 177.[10]

In this case, plaintiff has alleged direct, personal involvement by the corporation's directors in decisions and acts that are causally related to the alleged injury. Thus, the claim rests on much more than current and former management's position as officers or employees of RMST. In addition, as already explained, current and former management are being sued for torts arguably committed in Virginia in their corporate capacities. Finally, as directors of the corporation, current and former management cannot be said to be mere employees or agents of RMST; by their decisions, they run and control the corporation. Although they were acting ostensibly on behalf of RMST, plaintiff has alleged that current and former management have actually been acting on their own behalf. Accordingly, the court will not allow the individual defendants' status as current and former directors to shield

9. While *Columbia Briargate* addresses the personal jurisdiction provision of the South Carolina long-arm statute, that state's long-arm statute, like Virginia's, is co-extensive with the reach of the Due Process Clause. *See id.* at 1057 (discussing South Carolina's long-arm statute); *Metzger,* 901 F.2d at 38 (discussing Virginia's long-arm statute).

10. Moreover, this case is not the typical case, as RMST is not merely a party in a normal case. This court oversees the very reason for this corporation's existence.

their contacts with Virginia in the personal jurisdiction analysis.

Finally, in this case, defendants cannot reasonably assert unfair surprise at being sued in Virginia, particularly when they have voluntarily presented RMST's financial condition before this court in the salvage action. Defendants "should not be able to establish immunity from jurisdiction by blinding [themselves] to a relationship [they have] created and sustained with [this] forum." *Reynolds Metals*, 862 F.Supp. at 1500. RMST's management should have reasonably anticipated that their individual actions in the discharge of their fiduciary duties would be subject to this court's scrutiny.[11]

### a. Arnie Geller

■ Mr. Geller is the President, CEO, and a Director of RMST. He resides in Georgia. He has been physically present in this court in litigation pertaining to RMST's salvor-in-possession status over the years. Geller testified or was present in this court four times between 2001 and 2002. Plaintiff's obstruction of justice claim relates to one of Geller's appearances in court, when Geller allegedly lied to Judge J. Calvitt Clarke, Jr., about his intent to keep the TITANIC's artifact collection together. Geller also attended the oral argument hearing in Richmond, Virginia in the United States Court of Appeals for the Fourth Circuit in February, 2002, in RMST's appeal in the salvage action.

Defendant Geller led the 1993 expedition to the TITANIC, which returned to Norfolk, Virginia. He also met the 2000 expedition in Norfolk to watch the disembarking of new artifacts obtained from the TITANIC wreck.

Geller, in his corporate role, has had regular contacts in Virginia with RMST's counsel, Mark Davis, to discuss business issues, litigation, and other matters. The parties stipulate that Geller's contacts with counsel occurred weekly for the past three to four years, that the communications took place by phone, e-mail, and telecopy, and that all of these contacts with counsel were related to the salvage action. Geller also met with Mr. Davis in person in Norfolk prior to and after court hearings. Mr. Davis has never represented defendant Geller individually.

Geller has made multiple telephone calls to Virginia on behalf of the company. While here to attend court hearings, Geller made numerous phone calls to people in and outside of Virginia, the majority of which relate to RMST business. His phone calls *to* Virginia include calls to counsel, interviews with Virginia reporters, calls to a company called Conservation Solutions,[12] calls to an independent contractor named Alfred Garr, and calls to John Hightower of the Mariner's Museum. While he was in Virginia in connection with the return of the 2000 expedition, Geller made and received approximately 100 calls on his cellular phone. *See* Pl.'s Supp. Mem., Ex. 9. Geller also used his personal credit card in Virginia to pay for $15,000 in fuel for one of the expedition ships, when the fuel supplier would not accept RMST's corporate American Express card. RMST reimbursed Geller.

Geller claims he has never sent any e-mails, faxes, or documents to anyone in Virginia, other than in his capacity as RMST's president. In the last five years, he claims he has never made a phone call *to* Virginia on a "personal basis." However, Geller prevented plaintiff from assess-

---

**11.** *See supra* note 10.

**12.** Conservation Solutions maintained and preserved the "Big Piece," the largest artifact ever retrieved from the TITANIC.

ing whether this was so during the limited discovery permitted by the court by redacting all non-Virginia phone calls and all calls to RMST's counsel in Virginia, Mark Davis. The parties dispute whether these redacted Virginia calls were all truly made to counsel.

Geller also presented this court with plans to use his Titanic Foundation to pursue ownership of the TITANIC artifact collection. RMST's Supplemental Periodic Report, filed July 19, 2001, makes clear that RMST and the Foundation are entirely separate entities. Thus, Geller's presentation of the Foundation was not done in his corporate RMST capacity.[13]

In summary, defendant Geller not only entered Virginia to attend court proceedings, but he also directed his activities toward the forum. His intentional contacts with Virginia are sufficient that he should "reasonably [have] anticipate[d] being haled into court [ ]here." *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559. This court's exercise of personal jurisdiction over defendant Geller is justified under the concept of general personal jurisdiction, *see Diamond Healthcare*, 229 F.3d at 450, as well as under the Virginia long-arm statute, and it comports with the Due Process Clause of the Constitution.

### b. Gerald Couture

■ Gerald Couture is a Vice-president, Chief Financial Officer, and a Director of RMST. He resides in Florida.

He traveled to Virginia one time to attend a hearing in the salvage action in September 2001. Like Geller, Couture has had regular contacts with RMST's counsel in Virginia to discuss business issues and other matters. The parties stipulate that Couture's contacts with Virginia counsel occurred monthly over the past two years, that the communications took place mostly by e-mail and fax, and that all of these contacts with counsel Mark Davis were related to the salvage action. Couture also met with Mr. Davis in person when he was in Norfolk for a court hearing. Mr. Davis has never represented defendant Couture individually.

Discovery also revealed that Couture has a brother in Virginia, whom he calls a handful of times each year. Like Geller, Couture engaged in conversation with an independent contractor in Virginia named Alfie Garr. Finally, Couture also had a series of conversations with an accounting firm in Virginia related to tax work for RMST.

Although Couture's contacts with Virginia are less extensive than Geller's contacts, they suffice to establish the requisite minimum contacts. Defendant Couture could reasonably anticipate being sued in Virginia given his contacts with the state and this court in Virginia.[14]

### c. Nick N. Cretan and Doug Banker

■ Both Cretan and Banker are Directors of RMST. Cretan resides in New

---

13. The Titanic Foundation consists of Geller, Geller's wife, Judith B. Geller, and Robert A. Cohen, M.D. *See* RMST's Supplemental Periodic Report at 5, filed in Action No. 2:93cv902 on July 19, 2001. The Foundation was organized, in part, for the purpose of "acquiring and conserving artifacts from the *Titanic* [sic], together with archival and scientific date, and making those artifacts and data available to interested members of the general public...." *Id.* at 3–4.

14. This court's exercise of personal jurisdiction over Couture's person is not unreasonable in light of Couture's position as a Director of RMST and his relationship with RMST, a corporation that has had an established presence before this court for the past decade.

York, and Banker resides in Michigan. Plaintiff's complaint does not allege that Cretan or Banker engaged in a single specific act within or directed toward Virginia. However, plaintiff's memorandum in opposition to defendant Marsh's and the Geller defendants' motions to dismiss asserts that these two defendants, Cretan and Banker, enabled Geller, Harris, and Marsh to do their misdeeds against the corporation.[15] After plaintiff conducted discovery, he mentioned in a footnote in his supplemental memorandum in opposition to the various motions to dismiss that he wished to dismiss Cretan and Banker from the suit.[16]

One day after plaintiff filed his supplemental memorandum, RMST filed a Supplemental Periodic Report in the salvage action, announcing the corporation's intent to voluntarily relinquish its salvor-in-possession status. Plaintiff in this suit then requested leave to file a sur-reply in response to defendants' then-forthcoming supplemental briefs, so as to have an opportunity to address the directors' latest actions. The expected sur-reply was never filed. However, by motion filed September 20, 2002, plaintiff requested a preliminary injunction to prevent RMST from relinquishing its salvor-in-possession status in the salvage action. In his motion for a preliminary injunction, again in a footnote, plaintiff requested leave to reassert his claims against Cretan and

Banker. *See* Pl.'s Mot. for Prelim. Inj. at 4 n. 2 and at Ex. 1. He asks the court to base personal jurisdiction over Cretan and Banker on their apparent knowledge that RMST planned to announce to this court its intent to voluntarily relinquish its salvor-in-possession status, and on their signatures on the Corporate Resolution submitted to this court with RMST's Supplemental Periodic Report in the salvage action. *Id.*

Thus, Cretan's and Banker's apparent knowledge and their signatures on the Corporate Resolution are the only Virginia contacts plaintiff has alleged against defendants Cretan and Banker. Accordingly, the court must base its analysis of whether the requirements of due process are satisfied on these alleged facts. Both acts relate to RMST's *purported intent* to relinquish salvor-in-possession status, which has neither been made part of plaintiff's complaint nor been addressed by this court. Therefore, the alleged minimum contacts with Virginia cannot suffice to satisfy due process. Accordingly, defendants Cretan and Banker are ORDERED DISMISSED as parties to this lawsuit.[17]

### d. G. Michael Harris

Harris is a former officer and director of RMST. He was employed by RMST as Executive Vice President and

---

15. "Upon information and belief, by and through their actions as officers, directors, and/or principal shareholders of RMST, [Couture, Cretan, Banker, and Marsh] have had intentional contacts with Virginia based upon the litigation at issue and/or upon RMST's business ventures in Virginia." Pl.'s Opp. to Geller and Marsh at 8.

16. Pl.'s Supp. Mem. of Law in Opp. at 3, n. 5. "In order to streamline these proceedings and to demonstrate the good faith of plaintiff in preparing these papers, plaintiff hereby voluntarily agrees to dismiss defendants Nick Cretan and Doug Banker from this lawsuit,

without prejudice, based upon their deposition testimony and written discovery responses. However, should further discovery indicate that they took an active part in the wrongful conduct as set forth in the complaint, plaintiff will seek their return to this lawsuit. Accordingly, in light of this voluntary dismissal, this brief solely addresses defendant Arnie Geller, Gerald Couture, G. Michael Harris and Joseph Marsh." *Id.*

17. Thus, the designation of "the Geller defendants" hereinafter refers only to defendants Geller, Couture, and RMST.

Chief Operating Officer until August 27, 2000. He has not been a director of RMST since September 2000. He admits he was in Virginia three times, to the best of his recollection. Each visit to Virginia was made on behalf of RMST. Harris attended periodic report hearings in this court in March 2000 and in September 2000. He led the 2000 Titanic Expedition, which departed from Norfolk in July 2000. In connection with the departure of the 2000 Titanic Expedition, Harris held several press conferences in Norfolk and met with RMST's attorneys prior to departure. He also communicated with a Virginia newspaper reporter by e-mail during the 2000 expedition and engaged in communications with Conservation Solutions, a Virginia corporation that maintained and preserved the "Big Piece." *See* Pl.'s Supp. Mem., Ex. 21.[18]

Harris' other contacts with Virginia involve phone calls, e-mails, and faxes to and from counsel for RMST. The parties stipulate that during Harris' tenure with the corporation, he had regular contact with counsel for RMST. Harris and counsel Mark Davis were in contact biweekly, and they met in person on a couple of occasions when Harris was in Norfolk for court hearings. All of Harris' contact with counsel Mark Davis pertained to the salvage litigation, and Mr. Davis has never represented Harris individually.

Defendant Harris has had repeated, continuous, and voluntary contacts with Virginia in connection with the litigation before this court in the salvage action and the Titanic Expedition 2000. Accordingly, the court's exercise of personal jurisdiction over defendant Harris is justified under the Virginia long-arm statute and comports with the Due Process Clause of the Fourteenth Amendment.

### *e. Joe Marsh*

■ Joe Marsh is not formally a member of RMST's management, but he allegedly helped organize the hostile takeover of RMST management in November of 1999. He is purportedly RMST's largest shareholder and owns between 11% and 19% of the outstanding shares. He resides in Ohio.

The complaint asserts that Marsh transacts business here, either directly or through his agents. *See* Compl. ¶ 11(a).[19] Marsh's affidavit asserts that he does not transact business in Virginia. Marsh Aff. ¶¶ 1–5. However, Marsh admits that he met George Tulloch, who was RMST's President prior to the hostile takeover of November 1999, in an airport in Arlington, Virginia, sometime after November of 1999. Marsh Supp. Aff. ¶ 4.[20] Tulloch's affidavit stated that the subject matter of the meeting was Marsh's desire to sell the artifacts. Tulloch Supp. Aff. ¶ 8. Marsh also had contact with RMST's Virginia counsel, Mark Davis, in a conference call about two years ago. It is unclear who initiated the call.

Other contacts Marsh had with Virginia are disputed, based upon the conflicting affidavits of Marsh and Tulloch. Namely, Marsh reportedly made several phone calls related to RMST business during the meeting, Tulloch Supp. Aff. ¶ 10, but

---

18. *See supra* note 12.

19. Specifically, plaintiff alleges that Marsh "has dominated and controlled RMST and/or the other individual defendants" since the hostile takeover in November 1999. Compl. ¶ 6. In other filings, plaintiff alleges that Marsh influences defendant Geller's decisions with regard to RMST, implicating that their relationship is tantamount to one of agency.

20. Marsh claims he did not realize the airport was located in Virginia. Marsh Supp. Aff. ¶ 4.

Marsh does not remember making any RMST business-related calls. Marsh Supp. Aff. ¶ 9. Tulloch states that in March 2000 in the Crystal City section of Arlington, Virginia, he engaged in a lengthy conference call with defendants Marsh and Geller related to RMST business, partly having to do with Marsh's announced intent to sell TITANIC artifacts. Tulloch Supp. Aff. ¶ 11.[21]

As plaintiff is entitled to the favorable inferences from the pleadings, affidavits, and documents submitted in the case thus far, the court finds, *for purposes of this motion to dismiss* under Rule 12(b)(2), that the meeting Marsh held with Tulloch in the airport in Arlington, Virginia, pertained to the alleged scheme to loot RMST and defraud its shareholders; that Marsh made several telephone calls during the meeting, all of which were related to RMST; that Marsh initiated the conference call to Mark Davis; that Marsh engaged in the previously-described conference call with Marsh and Geller; and that Geller, in his capacity as President of RMST, sometimes acted as Marsh's agent. Thus, the court concludes that Marsh directed his actions at Virginia in more than a random, fortuitous, or attenuated way, and the court's exercise of personal jurisdiction over him does not offend due process.

**B. Federal Statutes**

Under Rule 4(k)(1)(D), federal district courts are permitted to exercise personal jurisdiction when authorized by a federal statute. The Fourth Circuit, like several other federal circuits, has held a "national

contacts" standard applicable when federal law authorizes nationwide service of process. *See Hogue v. Milodon Eng'g, Inc.*, 736 F.2d 989, 991 (4th Cir.1984) (nationwide service under Bankruptcy Rule 704) ("Where Congress has authorized nationwide service of process by federal courts under specific federal statutes, so long as the assertion of jurisdiction over the defendant is compatible with [Fifth Amendment] due process, the service of process is sufficient to establish jurisdiction of the federal court over the person of the defendant."); *United States v. Irvine & Assoc., Inc.*, 645 F.Supp. 845, 848 (E.D.Va.1986) (applying national contacts test in evaluating personal jurisdiction under the Miller Act).

**1. RICO Claim Against "Takeover Defendants"**

▮▮▮▮ Plaintiff pleads RICO violations against defendants Geller, Harris, and Marsh, whom he refers to as the "Takeover Defendants." *See* Compl. ¶ 19. The RICO statute authorizes venue for civil cases in any district in which the defendant resides, is found, has an agent, or transacts his affairs. 18 U.S.C. § 1965(a). The statute also authorizes service of process in any judicial district in which such person resides, is found, has an agent, or transacts his affairs. 18 U.S.C. § 1965(d). The Fourth Circuit has determined that section 1965(d) authorizes nationwide service of process and, thus, the exercise of personal jurisdiction in any district court. *ESAB Group*, 126 F.3d at 626.[22] Service of process is sufficient to

---

**21.** Finally, Tulloch's affidavit states that defendant Harris told him in September 2000 that defendant Marsh called Harris in Norfolk in July 2000 during preparations for the 2000 expedition to emphasize the goal of the expedition was to obtain TITANIC artifacts that could be sold. Tulloch Supp. Aff. ¶ 12. Be-

cause the statement is hearsay, the court has not considered it in analyzing Marsh's contacts with Virginia.

**22.** As long as a defendant is served with process pursuant to RICO's provisions, suit can be brought in *any* federal district court. *Id.*

establish a federal court's exercise of jurisdiction over the defendant as long as the assertion of jurisdiction comports with due process. *Id.* Because a federal statute provides the basis for personal jurisdiction, the Fifth Amendment's Due Process Clause applies to protect "the liberty interests of individuals against unfair burden and inconvenience." *Id.* "[I]t is only in highly unusual cases that inconvenience will rise to a level of constitutional concern." *Id.* at 627 (citation omitted). "The burden is on the defendant to demonstrate that the assertion of jurisdiction in the forum will make litigation so gravely difficult and inconvenient that he unfairly is at a severe disadvantage in comparison to his opponent." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 948 (11th Cir.1997) (citing *Burger King,* 471 U.S. at 478, 105 S.Ct. 2174) (internal quotations and alterations omitted).

▬ Because defendants Geller, Harris, and Marsh have been validly served pursuant to RICO's nationwide service provision, *in personam* jurisdiction over them is established, provided that it comports with due process considerations. *See ESAB Group,* 126 F.3d at 626. As there is no evidence in the record suggesting extreme inconvenience or unfairness in litigating in this forum, *in personam* jurisdiction comports with due process in this case. *Id.* (citing 4 Wright & Miller, *Federal Practice and Procedure* § 1067.1, at 331 (1987)) (congressional policy choice that includes nationwide service of process "should be afforded substantial weight"); *see also Republic of Panama,* 119 F.3d at 946 ("Only when a defendant challenging jurisdiction has 'presented a compelling

case that … would render jurisdiction unreasonable' should courts weigh the federal interests favoring the exercise of jurisdiction.") (citations omitted). Defendants Geller and Harris have frequented this forum in relation to the salvage litigation and will experience little additional inconvenience by defending this suit in Virginia. Exercising jurisdiction over Marsh would not violate the Fifth Amendment's Due Process Clause, especially when Marsh, who resides in Ohio, expresses willingness to have the suit brought in Florida or Connecticut. *See* Marsh Br. in Reply to Pl.'s Opp. to Geller and Marsh at 6 n. 6; Marsh Reply Br. at 7.

▬ Because *in personam* jurisdiction over defendants Geller, Harris, and Marsh is established pursuant to RICO's nationwide service provision, the court may exercise pendent personal jurisdiction over all the claims against these defendants. This would be true even if the court had determined that Virginia's long-arm statute was not an appropriate basis for jurisdiction over any of the three defendants. When a federal statute authorizes nationwide service of process, and the remaining state law claims arise from the same nucleus of operative facts, the court may exercise pendent personal jurisdiction to adjudicate state claims that are properly within the court's subject matter jurisdiction, *ESAB Group,* 126 F.3d at 627–28, as long as the "federal claim is not wholly immaterial or insubstantial." *Id.* at 629. However, if the court were to later determine that the federal claim(s) should be dismissed against a defendant, the state claims against that defendant would also have to

at 628. Although 18 U.S.C. § 1964(b) provides that other parties residing in any other district may be brought before the court if it is shown that the ends of justice so require, the Fourth Circuit seems to have eradicated the

"ends of justice" inquiry by using section 1964(d) to acquire personal jurisdiction. *See Sadighi v. Daghighfekr,* 36 F.Supp.2d 267, 271–74 (D.S.C.1999) (discussing Fourth Circuit's approach).

be dismissed, unless another basis for asserting personal jurisdiction exists.

██ To defeat plaintiff's use of the nationwide service of process provision, the "Takeover Defendants" must meet the high burden of establishing that plaintiff's RICO claim against them is not colorable, i.e., that it is implausible, insubstantial, or frivolous. *See ESAB Group,* 126 F.3d at 629; *Republic of Panama,* 119 F.3d at 941–42; *Sadighi,* 36 F.Supp.2d at 271. In the context of an ERISA claim, the Fourth Circuit noted that a "claim is colorable if it is arguable and nonfrivolous, whether or not it would succeed on the merits." *Davis v. Featherstone,* 97 F.3d 734, 737–38 (4th Cir.1996).[23]

██ Title 18 U.S.C. § 1962(c) provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." According to 18 U.S.C. § 1961, racketeering must involve the commission of two or more predicate acts, including mail fraud and obstruction of justice. A plaintiff must plead all elements of the alleged violation of section 1962 in order to state a civil claim under section 1964(c). *Sedima, S.P.R.L. v. Imrex, Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Thus, plaintiff must allege "(1)

conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* Plaintiff must additionally show that (5) he was injured in his business or property (6) by reason of the RICO violation. These two additional elements are viewed as standing requirements, *id.* at 496–97, 105 S.Ct. 3275; both but-for and legal cause must be shown. *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Brandenburg v. Seidel,* 859 F.2d 1179, 1187 (4th Cir.1988). "The pertinent inquiry in determining the existence of proximate, or 'legal' cause, is 'whether the conduct has been so significant and important a cause that the defendant should be held responsible.' " *Chisolm v. TranSouth Fin. Corp.,* 95 F.3d 331, 336 (4th Cir.1996) (quoting *Brandenburg,* 859 F.2d at 1189) (other citations omitted).

██ The "Takeover Defendants" contest nearly every aspect of plaintiff's allegation of the elements, contending that the claim is not colorable. However, plaintiff has alleged that these defendants engaged in a pattern of racketeering conduct in the alleged looting scheme, and other practices, that began in November 1999 and continues into the present. To establish the pattern of racketeering conduct, plaintiff alleges more than two predicate acts of mail fraud,[24] which in this case consist of payments to insiders and the members of the "Takeover Group"[25] and at least one

---

**23.** The court will readdress the required elements of a sufficiently pled RICO complaint in ruling on the defendants' motion to dismiss Claim 3. At this juncture, plaintiff must merely demonstrate that the claim is non-frivolous. Accordingly, the court's exposition of the law is brief here but will be fully addressed *infra* at section V.C.

**24.** Defendants contend that fraud was not pled with particularity as required by Rule 9 of the Federal Rules of Civil Procedure, and

the court noted at oral argument that it appears plaintiff has not sufficiently specified who has committed the mail fraud. The complaint does not fully inform each of the three defendants of the nature of his alleged participation in the mail fraud. *See infra* section V.C.1.a.

**25.** The "Takeover Group" appears to include individuals other than Geller, Harris, and Marsh, the "Takeover Defendants." *See* Compl. ¶¶ 6, 19, 33(h). However, the identity

predicate act of obstruction of justice committed by defendant Geller in allegedly making false statements to this court. Plaintiff also alleges that RMST, as well as its shareholders, are injured by reason of the RICO violation because the mail fraud is the instrument being used to loot the company. Plaintiff further explains that the alleged obstruction of justice was very harmful to RMST because the misrepresentation to the court thwarted the court's administration of salvor rights and its ability to act as guardian to ensure the artifacts would be properly handled. *See* Pl.'s Opp. to Geller and Marsh at 27.

Accordingly, the RICO claim is close enough to what is required that it cannot be said to be "wholly insubstantial and immaterial." *ESAB Group*, 126 F.3d at 629. It is *at least* arguable and nonfrivolous, even if plaintiff ultimately may not prevail on the merits.[26]

#### 2. *Securities Exchange Act Claim Against Defendant Marsh*

Title 15 U.S.C. § 78aa gives exclusive jurisdiction of violations of the Securities Exchange Act of 1934 ("Securities Exchange Act") to federal district courts. The section specifies where venue lies[27] and how service of process may be made. "[P]rocess in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found." 15 U.S.C. § 78aa (2002). ▮▮▮ According to the Second Circuit, section 78aa merely requires personal service anywhere in the United States in order to properly assert personal jurisdiction, as long as that service comports with due process requirements. *See Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974); *see also Fitzsimmons v. Barton*, 589 F.2d 330, 333 (7th Cir.1979); *Miller v. Asensio*, 101 F.Supp.2d 395, 402–03 (D.S.C.2000). Due process requires that the service of process "must be reasonably calculated to inform the defendant of the pendency of the proceedings in order that he may take advantage of the opportunity to be heard in his defense." *Mariash*, 496 F.2d at 1143. The *Mariash* court expressly rejected any requirement that a defendant have minimum contacts with the state seeking to exercise personal jurisdiction. The only "minimum contacts" required are contacts with the United States, as it is the sovereign seeking to exercise jurisdiction. *Id.; see also Sec. Investor Prot. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir.1985); *Fitzsimmons*, 589 F.2d at 333; *Miller*, 101 F.Supp.2d at 399.

For purposes of determining service of process and personal jurisdiction under 15 U.S.C. § 78aa, the court assumes that plaintiff has stated a cause of action on the Securities Exchange Act claim.[28] Marsh does not dispute that he was served within the United States or that he has contacts with the United States sufficient to support personal jurisdiction. Thus, this court may exercise personal jurisdiction over Marsh pursuant to 15 U.S.C.

---

of all of these other individuals is not clear from the complaint.

**26.** Also, plaintiff may need to amend his complaint to allege greater specificity in order to survive further dispositive motions. *See supra* note 24.

**27.** Venue under 15 U.S.C. § 78aa is addressed *infra* at section III.B.

**28.** The court notes that defendant Marsh moves to dismiss Claim 5, the Securities Exchange Act claim, only on the basis of improper venue under Rule 12(b)(3) and 15 U.S.C. § 78aa. Marsh directs his motion to dismiss for failure to state a claim only to Claims 1 through 4. *See* Br. in Supp. of Marsh Mot. to Dismiss at 7–17.

§ 78aa.[29] Since defendant Marsh's motion to dismiss for insufficient service of process is based on the court's alleged lack of personal jurisdiction over him, it is **DENIED**.

### III. Motions Regarding Venue

### A. Defendants' Motions to Transfer Venue

Plaintiff's complaint alleges that venue is proper in this district on several grounds. The most relevant bases are pursuant to 28 U.S.C. § 1391(b),[30] because a substantial part of the events giving rise to the action occurred in this district, and pursuant to 18 U.S.C. § 1965.[31]

■ All defendants seek a transfer pursuant to 28 U.S.C. § 1404(a), which states that "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Various defendants move to transfer this action to the District of Connecticut[32] or to an unspecified district in Florida.[33] There is

---

**29.** Plaintiff did plead a cause of action under the Securities Exchange Act against Marsh, *see supra* note 28 and accompanying text; plaintiff did not argue this cause of action as a ground for personal jurisdiction. However, the court may consider 15 U.S.C. § 78aa as a basis for personal jurisdiction, even though plaintiff did not specifically raise it in his pleadings to sustain personal jurisdiction. *See, e.g.,* 4 Wright and Miller, *Federal Practice and Procedure* § 1067.6 (3d ed.2002) (collecting cases and noting that "strictly speaking, under Federal Rule 8(a) plaintiffs are not required to plead the basis for personal jurisdiction over defendants."). Moreover, courts are more acutely concerned with subject matter jurisdiction than with personal jurisdiction, yet a plaintiff's failure to plead the correct jurisdictional basis does not necessarily fatally affect his claim. *See, e.g., May v. Supreme Court of Colorado,* 508 F.2d 136, 137 (10th Cir.1974) (subject matter jurisdiction may be sustained on the basis of a statute not relied on or alleged in the pleadings); *Paynes v. Lee,* 377 F.2d 61, 64 (5th Cir.1967) (plaintiff's claim not destroyed for his failure to plead the correct jurisdictional basis).

**30.** Under 28 U.S.C. § 1391(b), venue is appropriate in

1) a judicial district where any defendant resides, if all defendants reside in the same State, 2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or 3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

**31.** Title 18 U.S.C. § 1965 authorizes venue "in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs."

**32.** Defendant Marsh states he would not object to the transfer of this action to the District of Connecticut. *See* Marsh Br. in Reply to Pl.'s Opp. to Geller and Marsh at 6 n. 6. Marsh also asserts that other fora would have personal jurisdiction over all defendants, including Florida and Connecticut. *See* Marsh Reply Br. at 7. The Geller defendants suggest that transfer to the District Court of Connecticut is most appropriate, as they contend this action is closely related to a suit filed in the United States District Court for the District of Connecticut. Thus, transferring the suit to Connecticut would allow that court to resolve plaintiff's allegations in a manner consistent with the resolution of the similar lawsuit. However, it is the court's understanding that the lawsuit in Connecticut is no longer pending, as it was settled by the parties and was not judicially resolved. Moreover, the Geller defendants in the Connecticut case moved to transfer venue of that action to Florida. *RMS Titanic, Inv. v. Geller,* 2000 WL 306997 (D.Conn. Jan. 10, 2000) 2000 U.S. Dist. LEXIS 10947.

**33.** It appears that all defendants concede venue would lie in Florida. Defendant Harris moves to transfer the action to Florida because RMST is a Florida corporation, defendants Couture and Harris reside in Florida, and defendant Marsh allegedly maintains a residence in Florida; additionally, some of the claims presented involve Florida law.

no question that the case could have been brought in Florida;[34] it is not entirely clear whether this action could originally have been brought in Connecticut.

■■■■ "The decision whether to transfer an action [under section 1404(a)] is committed to the sound discretion of the district court." *Southern Ry. Co. v. Madden*, 235 F.2d 198, 201 (4th Cir.1956). The burden in a motion to transfer to a more convenient forum is on the movant to show that a transfer is proper. *Cognitronics Imaging Sys. v. Recognition Research Inc.*, 83 F.Supp.2d 689, 696 (E.D.Va.2000); *Verosol B.V. v. Hunter Douglas, Inc.*, 806 F.Supp. 582, 592 (E.D.Va.1992).

■■ In analyzing the propriety of a transfer, plaintiff's choice of forum is typically entitled to substantial weight, especially where plaintiff chooses his home district, *Chedid v. Boardwalk Regency Corp.*, 756 F.Supp. 941, 945 (E.D.Va.1991); however, if "a plaintiff chooses a foreign forum and the cause of action bears little or no relation to that forum, the plaintiff's chosen venue is not entitled to such substantial weight." *Cognitronics*, 83 F.Supp.2d at 696. In the case *sub judice*, the forum bears a substantial relationship to the cause of action, given this court's jurisdiction over the salvage rights of RMST and the issues involved. While Virginia is not a home forum for either party, it *is* the home forum for the underlying action from which this litigation arises.

Other factors to consider in deciding whether to transfer include ease of access to sources of proof; the convenience of the parties and witnesses, and the costs associated with the attendance of witnesses; and the interests of justice. *Id.* Since the parties have presented no arguments regarding the ease of access to sources of proof or convenience to witnesses, the court attributes little weight to these factors. As none of the parties reside in Virginia, all parties will experience some inconvenience in litigating in this forum. Plaintiff chose this forum, so the inconvenience he may suffer is not a factor of concern. The court finds that defendants Geller and Couture will not be severely inconvenienced, as they come to this forum with some regularity in attending to matters in the salvage litigation. Defendant Harris is no longer required to travel to Virginia on RMST's behalf because he is no longer a member of RMST's management. Defendant Marsh claims he does not come to Virginia at all. Although these two defendants may experience some measure of inconvenience, the court finds that the balance of conveniences test weighs in favor of retaining jurisdiction over this matter.

Finally, the interests of justice weigh in favor of denying the requested transfer, as this court is uniquely familiar with the context in which plaintiff's claims are presented.[35] Defendants do not articulate specifically why the action should be brought in any other district; thus, they have not met the legal burdens required

---

The Geller defendants and defendant Marsh also admit that venue appears proper in Florida because RMST is incorporated in Florida.

**34.** *See supra* note 33.

**35.** The court recognizes that in deciding what the interests of justice require, avoidance of a multiplicity of litigation is an important consideration. *See Cont'l Grain Co. v. Barge FBL–585*, 364 U.S. 19, 20–21, 80 S.Ct. 1470, 4

L.Ed.2d 1540 (1960); *Wood v. Barnette, Inc.*, 648 F.Supp. 936, 939 (E.D.Va.1986). However, there is currently no similar action pending in Connecticut, as the Connecticut litigation was settled. The Geller defendants vaguely assert that similar claims are pending in litigation in Florida, but they have not provided the court with any details to allow the court to adequately evaluate the propriety of transferring this action to Florida.

for a change of venue. Accordingly, the defendants' motions to transfer venue are **DENIED**.

### B. Defendant Marsh's Motion to Dismiss Claim 5 for Improper Venue

 Claim 5 is a derivative action under Rule 23.1 of the Federal Rules of Civil Procedure and is brought against defendant Marsh for allegedly violating section 16(b) of the Securities Exchange Act, specifically 15 U.S.C. § 78p(b).[36] On behalf of RMST, plaintiff seeks to disgorge profits he claims Marsh realized from insider trading conducted between December 2000 and January 2001.

Marsh moves for dismissal of this claim for improper venue under 28 U.S.C. § 1406(a) and Rule 12(b)(3) of the Federal Rules of Civil Procedure. In the alternative to dismissal of the claim, he seeks correction of improper venue by transfer to a more appropriate district.[37]

Section 27 of the Securities Exchange Act gives exclusive jurisdiction of violations of the Act to federal district courts, and venue is set forth as follows:

> Any suit or action to enforce any liability or duty created by [the Exchange Act] or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, *may* be brought in any [district wherein any act or transaction constituting the violations oc-

curred] or in the district wherein the defendant is found or is an inhabitant or transacts business . . . .

15 U.S.C. § 78aa (emphasis added).

Plaintiff claims to have demonstrated that Marsh transacted business in Virginia sufficient to lay venue for Claim 5 in this court. However, it appears that plaintiff merely alleged in a conclusory fashion that Marsh transacted business in Virginia. Moreover, plaintiff neither contends that Marsh was found in this forum nor that he is an inhabitant of this district. Finally, plaintiff has alleged no facts showing that an act or transaction constituting the securities fraud violation occurred in this state.

 Venue is not jurisdictional. *See Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 167–68, 60 S.Ct. 153, 84 L.Ed. 167 (1939). Jurisdiction is the power to adjudicate, while venue relates to the place where judicial authority may be exercised and is intended for the convenience of the litigants. *Id.; see also Leroy v. Great W. United Corp.*, 443 U.S. 173, 180, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979) (Securities Exchange Act case). This court has both subject matter and personal jurisdiction over the Securities Exchange Act claim.[38]

 Under 28 U.S.C. § 1406(a), the "district court of a district in which is filed a *case* laying venue in the wrong division

---

**36.** Title 15 U.S.C. § 78p(b) attempts to prevent, *inter alia*, a beneficial owner of more than 10% of any class of any equity security from unfairly using information obtained by reason of his relationship to the issuer. The section provides that any shareholder may bring a suit to disgorge profits *if* the corporation fails or refuses to bring such a suit within 60 days after a request.

**37.** Marsh contends that venue for this claim is proper against him only in his home district of Ohio. *But see supra* note 32.

**38.** Title 15 U.S.C. § 78aa's service of process provision, which indirectly addresses personal jurisdiction, provides: "Process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found." Personal jurisdiction "goes to the court's power to exercise control over the parties," while venue "is primarily a matter of choosing a convenient forum." *Leroy*, 443 U.S. at 180, 99 S.Ct. 2710. In this case, the court has determined that personal jurisdiction is proper. *See supra* section II.B.2.

or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." (emphasis added). However, Claim 5 is the only claim for which venue is arguably improper; there is no question that venue is proper in the Eastern District of Virginia as to the remainder of the case.[39] Despite lack of venue over a claim, the court may exercise its discretion to apply the principle of pendent venue to claims that arise out of a common nucleus of operative facts, after considering factors such as judicial economy, convenience, and the avoidance of piecemeal litigation. *See, e.g., Bolton v. Gramlich,* 540 F.Supp. 822, 842 (S.D.N.Y. 1982) (finding that court had discretion to retain jurisdiction over claim alleging violations of section 16(b) of the Securities Exchange Act when venue was proper as to another, related federal issue); *see also Beattie v. United States,* 756 F.2d 91, 103 (D.C.Cir.1984) (discussing concept of pendent venue, specifically in relation to venue provision of Federal Tort Claims Act, 28 U.S.C. § 1402(b)).

From the allegations of the complaint in its entirety, Claim 5 against Marsh appears to be factually related to the other claims asserted in this action. The court could transfer Claim 5 to the district in Ohio where Marsh resides, but the court finds in the interest of judicial economy and to avoid piecemeal litigation that it should refrain from transferring the claim at this time. Accordingly, defendant Marsh's motion to dismiss Claim 5 for improper venue is **DENIED**. However, if it appears at a later time, after full discovery, that the claim does not arise out of a common nucleus of operative facts related to the other allegations and claims in the case, Marsh will be given leave to renew his motion.

**39.** *See supra* section III.A.

## IV. Failure to Make Demand on RMST's Board of Directors

Under Rule 23.1 of the Federal Rules of Civil Procedure, a plaintiff bringing a shareholder derivative suit is required to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1. Plaintiff alleges that such demand would have been futile because the defendants are in sole control of RMST. All of the defendants contend that the court must dismiss Claims 1, 2, 3, and 4, because plaintiff failed to allege with particularity the futility of making a demand on the RMST board.

"[T]he decision as to whether a plaintiff's allegations of futility are sufficient to excuse demand depends on the particular facts of each case and lies within the discretion of the district court." *Reilly Mortgage Group, Inc. v. Mount Vernon Sav. and Loan Assn.,* 568 F.Supp. 1067, 1078 (E.D.Va.1983) (quoting *Lewis v. Graves,* 701 F.2d 245, 248 (2d Cir.1983)). State law governs the pre-suit demand requirement and the actions by the board of directors. *Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). Under Florida law, a shareholder should show that he has exhausted all means within the corporation to redress his grievances before he is permitted to bring a derivative suit. *Orlando Orange Groves Co. v. Hale,* 107 Fla. 304, 144 So. 674, 678 (1932). Although general allegations of wrongful refusal to sue are insufficient, *James Talcott, Inc. v. McDowell,* 148 So.2d

36, 38 (Fla.App.1962), demand is excused when the directors, because of their "guilty participation in the wrongs complained of, cannot be expected to institute suit." *Orlando Orange,* 144 So. at 678 (citation omitted). "Allegations of participation [or] acquiescence by the majority of the board of directors of a corporation are sufficient to establish futility of demand." *First Am. Bank & Trust v. Frogel,* 726 F.Supp. 1292, 1298 (S.D.Fla.1989) (citation omitted).

In this case, plaintiff specifically alleges self-dealing of *all* the members of the current and former management, as well as of "insider" shareholder Joe Marsh. Because of their alleged participation in the wrongs complained of, the Board of Directors could not be expected to institute suit on behalf of the corporation. *Orlando Orange,* 144 So. at 678; *see also First Am. Bank,* 726 F.Supp. at 1298.

The court finds that the demand requirement of Rule 23.1 is excused under the facts alleged here. Accordingly, defendants' motion to dismiss for failure to make a demand is **DENIED.**

## V. Failure to State a Claim Upon Which Relief May Be Granted

Plaintiff's Claims 1 through 4 are subject to motions to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Claim 1 is brought under Rule 23.1 of the Federal Rules of Civil Procedure (Derivative Actions by Shareholders). Plaintiff accuses the defendants of breaching their fiduciary duty by engaging in "fraud, self-dealing, mismanagement, diversion and waste of corporate assets." Compl. ¶ 1. Claim 2 is a derivative claim under Rule 23.1 for injunctive relief. Plaintiff seeks the removal of the current Board of Directors so as to prevent continued looting of the corpora-

tion. Claim 3 is brought against the "Takeover Defendants," Geller, Harris, and Marsh. Plaintiff alleges they engaged in predicate acts of mail fraud and obstruction of justice in a scheme to defraud RMST and its shareholders via a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962. Claim 4 seeks to recover damages from defendants for a wrongful denial of shareholders' voters' and dissenters' rights under Florida statutory law regarding the hostile takeover of RMST in November of 1999.[40]

A motion to dismiss made pursuant to Rule 12(b)(6) should not be granted unless it appears to a certainty that the nonmoving party cannot prove any set of facts in support of its claim that would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Labram v. Havel,* 43 F.3d 918, 920 (4th Cir. 1995). The standard governing Rule 12(b)(6) dismissal motions requires that a court reviewing such a motion accept the complaint's factual allegations as true and view the allegations in a light most favorable to the nonmoving party. *See, e.g., Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *G.E. Inv. Private Placement Partners II v. Parker,* 247 F.3d 543, 548 (4th Cir.2001).

## A. Defendant Marsh's Motion to Dismiss Claims 1 and 2

Plaintiff alleges that defendant Marsh owns 19% of RMST's outstanding shares, that he is a member of a majority voting group, and that he formed the group that engineered the hostile takeover in 1999 with majority control. Plaintiff contends the court should hold members of majority voting groups to a higher standard in protecting minority shareholders'

---

**40.** Plaintiff requests certification of a class action as to Claim 4.

rights. Marsh contends that Claim 1 must be dismissed against him because he does not owe a fiduciary duty to plaintiff or any other shareholder and that Claim 2 must be dismissed against him because he is not on the Board of Directors. Marsh claims to own only 13.6% of the outstanding shares and argues that under Florida law he is not subject to any fiduciary duties in relation to minority shareholders.

 Both parties have presented Florida cases that ostensibly support their contentions. Upon reviewing the cases cited by the parties, it appears clear to the court that Florida state law imposes a fiduciary duty on corporate officers who control the corporation through ownership of a majority of the stock. *Tillis v. United Parts, Inc.*, 395 So.2d 618, 619 (Fla.App. 1981); *cf. Martin v. Martin*, 529 So.2d 1174, 1176 (Fla.App.1988) (declining to find breach of fiduciary duty where defendants were majority stockholders and officers of corporation and obtained higher price per share via "control premium" than a minority stockholder could); *Schein v. Chasen*, 313 So.2d 739, 743–46 (Fla.1975) (indicating that liability for breach of fiduciary duty to corporation under state law may be appropriate where person occupied position such as officer, director, employee, or agent, but one with *no* relationship whatsoever to the corporation who trades its shares on the basis of insider information does not become a fiduciary). The general rule under Florida law is that majority shareholders owe no duty to minority shareholders with respect to the sale of the majority stock. *Draper v. Hay*, 555 So.2d 1306 (Fla.App.1990). Moreover, majority stockholders of a close corporation breach their fiduciary duty to minority stockholders in utilizing their control of the corporation to their own advantage as against the minority stockholders. *Tillis*, 395 So.2d at 619. However, Marsh has not provided authority indicating that Florida imposes *no duty* whatsoever on majority shareholders toward minority shareholders.[41] Plaintiff has not supported his assertion that Florida law imposes fiduciary duties on members of majority voting groups.

Defendant Marsh is neither a corporate officer nor a director; RMST is not a closely held corporation; and the claim presented for breach of fiduciary duty does not revolve around the sale of the majority stock. Thus, it appears that none of the situations in which a fiduciary duty can be imposed apply to defendant Marsh in this case. Accordingly, the court **GRANTS** defendant Marsh's motion to dismiss Claims 1 and 2, and the court **DISMISSES** Claims 1 and 2 against defendant Marsh.

### B. Geller Defendants' Motion to Dismiss Claim 2

 In Claim 2, plaintiff seeks the removal of the current Board of Directors to prevent continued self-dealing and looting of the corporation. The Geller defendants[42] move to dismiss Claim 2 for failure to state a claim for injunctive relief for two reasons: first, because they assert that Florida statutory and common law do not permit this extraordinary remedy; and secondly, because they contend plaintiff clearly has an adequate remedy at law

---

**41.** Other case law cited by plaintiff deals with fiduciary duties in the context of federal securities law and the Securities Exchange Act, *see, e.g., Xaphes v. Shearson, Hayden, Stone, Inc.*, 508 F.Supp. 882, 886 (S.D.Fla.1981); *Hanraty v. Ostertag*, 470 F.2d 1096, 1099 (10th Cir.1972), and is inapplicable to this state law claim for self-dealing and fraud.

**42.** The Geller defendants consist of Geller, Couture, and RMST. *See supra* notes 1 and 17. Claim 2 was not asserted against defendant Harris.

because he demands monetary damages for breach of fiduciary duty in Claim 1.

The court notes at the outset that defendants have failed to direct the court to relevant Florida law on these points. Defendants cite an Alabama case decided in 1930, *Gettinger v. Heaney*, 220 Ala. 613, 127 So. 195, 198 (1930), and *Fletcher's Cyclopedia of the Law of Private Corporations*, § 358 (Rev.Vol.1998), to support their contention that the equitable relief requested cannot be granted under Florida law. In support of their argument that plaintiff's remedies at law are adequate, defendants cite two Florida cases in which temporary injunctions were improperly granted. *See, e.g., Coral Springs v. Florida Nat'l Prop., Inc.*, 340 So.2d 1271 (Fla. App.1976); *Weinstein v. Aisenberg*, 758 So.2d 705 (Fla.App.2000). Defendants base the crux of their argument on a case in which plaintiffs sought a temporary injunction to protect assets because they feared the defendants would abscond with finances, such that a judgment could not be enforced. *Weinstein*, 758 So.2d at 706–07 (majority opinion), 707–12 (concurring opinion).

The court is not persuaded at this time that Claim 2 should be dismissed. Plaintiff in this case does not seek a preliminary injunction. Furthermore, it appears to the court that in Claim 1, plaintiff seeks recovery of monetary damages on behalf of the corporation to remedy *past* wrongs allegedly committed by some of the defendants in this case, while Claim 2 seeks injunctive relief to prevent the continuation of these alleged harms into the future. Accordingly, the Geller defendants' motion to dismiss Claim 2 is **DENIED** at this time.

## C. *"Takeover Defendants" ' Motions to Dismiss Claim 3*

Defendants Geller, Harris, and Marsh, against whom Claim 3 is asserted, move to dismiss the claim, i.e., the RICO violations, for failure to state a claim upon which relief may be granted. To test the legal sufficiency of plaintiff's allegations, the court must begin with an outline of RICO's requirements for recovery.

Plaintiff claims these defendants violated 18 U.S.C. § 1962(c), which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Plaintiff brings suit under 18 U.S.C. § 1964(c), which authorizes a civil action by "[a]ny person injured in his business or property by reason of a violation of § 1962." A successful civil RICO plaintiff can recover treble damages and costs, including attorney's fees. 18 U.S.C. § 1964(c).

A plaintiff must plead all elements of the alleged violation of section 1962 in order to state a claim under section 1964(c). *Sedima*, 473 U.S. at 496, 105 S.Ct. 3275. Thus, plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* Plaintiff must additionally show that (5) he was injured in his business or property (6) by reason of the RICO violations. The injury and causation components are viewed as standing requirements. *Id.* at 496–97, 105 S.Ct. 3275. The "Takeover Defendants" do not dispute the conduct or enterprise components, but they do contend that plaintiff has not properly alleged a pattern of racketeering activity or demonstrated that he was injured by reason of the RICO violations.

### 1. Racketeering Activity

Title 18 U.S.C. § 1961(1) defines racketeering activity, so far as is pertinent to this case, as "any act which is indictable under ... 18 U.S.C. § 1341 (relating to mail fraud), [and] ... 18 U.S.C. § 1503 (relating to obstruction of justice)." Section 1961(5) defines a "pattern of racketeering activity" as "at least two acts of racketeering activity, one of which occurred within ten years ... after the commission of a prior act of racketeering activity...." The indictable acts enumerated in section 1961(1) are commonly referred to as "predicate acts." Plaintiff alleges multiple predicate acts of mail fraud and at least one predicate act of obstruction of justice committed by defendant Geller in allegedly making false statements to this court. The claim also involves alleged filing of "false" periodic reports and failure to file required information with the Securities Exchange Commission.

### a. Mail Fraud

▉▉▉▉▉ Although a criminal conviction is not a prerequisite for recovery in a civil RICO action, the plaintiff must establish that indictable predicate acts occurred. *See Sedima,* 473 U.S. at 488, 105 S.Ct. 3275. Only two elements need be established to make out an indictable accusation of mail fraud: 1) a scheme to defraud, and 2) use of the mail for the purpose of executing the scheme. *See Schmuck v. United States,* 489 U.S. 705, 721, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). "To be part of the execution of the [mail fraud,] the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be 'incident to an essential part of the scheme.'" *Id.* at 710–11, 109 S.Ct. 1443 (citations omitted); *United States v. Photogrammetric Data Servs., Inc.,* 259 F.3d 229, 253 (4th Cir.2001). Ac-

cording to the Fourth Circuit, the key is whether the communication occurred "for the purpose of executing the scheme." *Morley v. Cohen,* 888 F.2d 1006, 1009–10 (4th Cir.1989).

▉▉▉▉ . Plaintiff's complaint alleges that the mail fraud in this case consisted of the mailing of payments to insiders and members of the "Takeover Group" [43] and that these payments were the primary instrument used in looting the company. Thus, he alleges that the use of the mails was at least incidental to or part of the purpose behind a scheme to defraud. Plaintiff has alleged facts sufficient for the court to find 1) a scheme to defraud, and 2) use of the United States Postal Service for the purpose of executing the scheme.

However, the court is of the opinion that plaintiff's allegations are not sufficiently specific to demonstrate *indictable* acts of mail fraud. The court noted at oral argument that the complaint provides no clear indication of who committed the mail fraud. The allegations of mail fraud are vaguely attributed to all defendants, rather than specifying each alleged fraudulent act committed by each individual.

The "Takeover Defendants" contend that fraud was not pled with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure and that the complaint does not inform each of the multiple defendants of the nature of his alleged participation in the fraud. Virtually every circuit that has confronted this issue has required some measure of particularity in pleading RICO actions based on mail fraud in accordance with Rule 9(b). *See, e.g., Emery v. Am. Gen. Fin.,* 134 F.3d 1321, 1322–23 (7th Cir.1998); *McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992); *Cayman Exploration Corp. v. United Gas*

---

**43.** *See supra* note 25.

*Pipe Line Co.,* 873 F.2d 1357, 1362 (10th Cir.1989); *Saporito v. Combustion Eng'g, Inc.,* 843 F.2d 666, 675 (3d Cir.1988); *Michaels Bldg. Co. v. Ameritrust Co.,* 848 F.2d 674 (6th Cir.1988); *Alan Neuman Prods., Inc. v. Albright,* 862 F.2d 1388, 1392 (9th Cir.1988); *Durham v. Bus. Mgmt. Assocs.,* 847 F.2d 1505, 1511–12 (11th Cir.1988); *New England Data Servs., Inc. v. Becher,* 829 F.2d 286, 289–90 (1st Cir.1987); *Bennett v. Berg,* 685 F.2d 1053, 1062 (8th Cir.1982).

To fully satisfy Rule 9(b), "a plaintiff must plead who, what, when, where and how," *Weill v. Dominion Res., Inc.,* 875 F.Supp. 331, 338 (E.D.Va.1994), all the elements of a good journalism piece. *See also Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir.1999) (explaining what circumstances must be alleged to conform with Rule 9). Plaintiff *has* indicated who *received* payments in the mail; he has generally explained what the payments consist of: either so-called salary, stock options, or stock transfers; in most cases he has given at least a month and year when the payment was made, and he has explained that these payments, which are part of the alleged scheme to loot the company, were made by the transmittal through the United States Postal Service. Plaintiff *has not* indicated who *sent* the payments or from where the payments were sent. *See* Compl. ¶ 55. In the specific context, however, plaintiff's reference to "the defendants" likely refers only to the so-called "Takeover Defendants," namely, Geller, Harris, and Marsh.

"A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [he] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison,* 176 F.3d at 784. In the case *sub judice,* plaintiff has gone beyond cursory allegations of predicate acts and has specified some details of the alleged predicate acts undertaken. It appears that plaintiff will be unable to more fully develop his allegations without the aid of full discovery. *See generally Mid Atl. Telecom, Inc. v. Long Distance Serv., Inc.,* 18 F.3d 260, 264 (4th Cir.1994) (focusing on the role of discovery in elaborating upon mail and wire fraud charges and emphasizing that the claims were "alleged in the complaint, and the plaintiff should have an opportunity to develop support for its claims through discovery"). Accordingly, plaintiff is given ten (10) days from the conclusion of discovery to file an amended complaint specifying, for all of the alleged payments, who sent them, when they were sent, and from where they were sent.[44]

### b. *Obstruction of Justice*

Under 18 U.S.C. § 1503(a), whoever "corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b)." A violation of § 1503 may consist of perjury, if accompanied by proof "that the false statements given, in some way, either obstructed or were intended to obstruct the due administration of justice." *United States v. Littleton,* 76 F.3d 614, 619 (4th Cir.1996) (citation and quotations omitted).

Plaintiff claims defendant Geller perjured himself by misrepresenting to this court that RMST would not sell arti-

---

**44.** The discovery deadlines will be set by the court at the Rule 16(b) scheduling conference, with an appropriate order to follow. The court further notes that for some payments plaintiff has already provided a date for when they were sent, but not for all.

facts when, in fact, he intended to sell artifacts. Plaintiff specifically claims that the allegedly false statements made in court were intended to obstruct or actually did obstruct justice by attempting to influence the due administration of justice. *See* Compl. ¶ 57. Moreover, plaintiff alleges that "false" periodic reports were filed and that defendants failed to file required information with the Securities Exchange Commission. Compl. ¶ 34. Accordingly, the court finds that plaintiff has sufficiently alleged predicate acts of obstruction of justice.

### 2. Pattern of Racketeering Activity

The RICO statute itself requires "at least two" instances of racketeering activity. 18 U.S.C. § 1961(5). Two acts are necessary but not sufficient to establish a pattern of racketeering activity. *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. 3275. In *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court held that a "pattern" requires a showing of a relationship between the predicate acts and a threat of continued criminal activity. *Id.* at 239, 109 S.Ct. 2893.

A relationship is shown by "criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. 2893 (quoting and drawing an analogy to 18 U.S.C. § 3575(e)). Plaintiff's allegations are clearly sufficient to satisfy the relatedness aspect of the requirement: he alleges the actions of the "Takeover Defendants" are focused on looting RMST and defrauding the shareholders. The alleged predicate acts of mail fraud and obstruction of justice are part and parcel of this alleged scheme,

having the same purpose, victims, participants, and so forth.

Whether plaintiff has demonstrated the continuity requirement is less clear. Continuity can be established either by showing a defined series of related and repeated predicate criminal acts over a substantial period ("closed-end continuity") or by showing past conduct that by its nature is open-ended and threatens future criminal activity. *See id.* at 241–42, 109 S.Ct. 2893. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.* Indeed, the Fourth Circuit has observed that "the heightened civil and criminal penalties of RICO are reserved for schemes whose scope and persistence set them above the routine." *HMK Corp. v. Walsey,* 828 F.2d 1071, 1074 (4th Cir.1987). A plaintiff can also show continuity by demonstrating that the predicate acts or offenses are "a regular way of conducting defendant's ongoing business," whether that business "exists for criminal purposes" or is otherwise "legitimate." *H.J., Inc.,* 492 U.S. at 242–43, 109 S.Ct. 2893.

The focus of the continuity inquiry is whether the related predicate acts indicate "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *Int'l Data Bank v. Zepkin,* 812 F.2d 149, 155 (4th Cir.1987); *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989). "Factors relevant to this inquiry include: the number and variety of predicate acts; the length of time over which they were committed; the number of putative victims; the presence of separate schemes; and the potential for multiple distinct injuries," *Brandenburg,* 859 F.2d at 1185, but no single factor is determinative.

Plaintiff alleges a pattern of racketeering conduct that consists of two basic types of predicate acts: mail fraud and obstruction of justice. He claims the alleged looting scheme and other practices began in November 1999 and continue into the present. It appears from the complaint that the last known instance of mail fraud occurred in May of 2001. *See* Compl. ¶ 33. Thus, on the surface it would appear that the alleged scheme has continued for only eighteen months. Taking into consideration plaintiff's allegation that the alleged scheme continues into the present, however, the actual length of the alleged pattern of racketeering activity is currently twenty-eight months.

The putative victims in this scheme include not only RMST, on whose behalf the claim is made, but also indirectly include *all* of the corporation's shareholders, who number well over one thousand. Finally, a clear potential for multiple, distinct injuries exists under the facts of this case. Not only are the corporation and shareholders being harmed financially, but continuation of the alleged scheme will also likely pose a special threat to social well-being, given both the historical significance and venerated status of the wreckage of the TITANIC. If RMST were to lose its salvor status due to the financial consequences of the defendants' alleged acts, all of society could suffer if the presently unrecovered artifacts remain at the bottom of the ocean. In addition, it is possible that the corporation may be unable to continue appropriate care and treatment of the recovered artifacts that are currently entrusted to RMST. The loss or destruction of these artifacts, even if inadvertent, would be a great loss to society, to history, and to the memory of the great ship TITANIC.

Based on all the factors discussed herein, the court determines that plaintiff has alleged sufficient continuity, as well as relationship, to establish a pattern of racketeering activity for purposes of these motions to dismiss.

### 3. Causation and Injury

The Fourth Circuit has repeatedly held, in agreement with the Supreme Court, that plaintiffs must show both but-for and legal cause that the predicate acts caused the harm. *See, e.g., Chisolm,* 95 F.3d at 336; *Caviness v. DeRand Res. Corp.,* 983 F.2d 1295, 1305 (4th Cir.1993); *Brandenburg,* 859 F.2d at 1187; *see also Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). "The pertinent inquiry in determining the existence of proximate, or 'legal' cause, is 'whether the conduct has been so significant and important a cause that the defendant should be held responsible.'" *Chisolm,* 95 F.3d at 336 (quoting *Brandenburg,* 859 F.2d at 1189). If plaintiff fails in this regard, he ultimately cannot recover on a RICO claim.

When mail fraud is the predicate act, the complainant's injury must occur "by reason of" the scheme to defraud. The "Takeover Defendants" raise the issue that a plaintiff who alleges mail fraud as the predicate acts for RICO must allege that he "detrimentally relied in some way on the fraudulent mailing." *Chisolm,* 95 F.3d at 337 (internal footnote and citation omitted); *Brandenburg,* 859 F.2d at 1188–89 (detrimental reliance by the victim "is necessary to establish injury to business or property 'by reason of' a predicate act of mail fraud within the meaning of § 1964(c)"); *G.E. Inv.,* 247 F.3d at 548; *Mid Atl. Telecom,* 18 F.3d at 263.

The court notes that the cases discussing this "reliance" aspect of mail fraud in conjunction with RICO all deal with misrepresentations made to victims. Hence, the statement from *Chisolm:* "Where

fraud is alleged as a proximate cause of the injury, the fraud must be a 'classic' one. In other words, the plaintiff must have justifiably relied, to his detriment, on the defendant's material misrepresentation." 95 F.3d at 337. It appears to the court that defendants are incorrectly focusing on the type of mail fraud that *involves* misrepresentations.[45]

The RICO claim in this case turns not on the tort of fraud, but rather on a scheme to defraud by looting RMST, using various acts of mail fraud (as well as at least one act of obstruction of justice). It appears to the court that under these circumstances, the issue of reliance upon material misrepresentation is not relevant.[46] In this case, the mail fraud statute is allegedly being violated such that no actual misrepresentation, in the traditional sense of the tort of fraud, occurred. Here, the clearest proximate cause of the harm is the alleged mail fraud scheme itself, which intended to loot corporate assets to the detriment of shareholders. In fact, the dispersal of the payments through the mail directly led to the alleged injuries. Plaintiff does not allege that defendants mailed anything that contained misrepresentations;[47] nevertheless, mail fraud was *a* legal cause of the harm. Mail fraud need not be the sole legal cause—but it must be *a* legal cause. *Chisolm,* 95 F.3d at 337. With regard to *Brandenburg*'s causation

requirement, plaintiff sufficiently alleges causation, as the mail fraud "has been so significant and important a cause that the defendant should be held responsible." 859 F.2d at 1189 (citations omitted).

Finally, plaintiff alleges that RMST, as well as plaintiff and other shareholders, are injured by reason of the RICO violation because the mail fraud is the primary instrument being used to loot the company. Plaintiff further explains that the alleged obstruction of justice was very harmful to RMST because the misrepresentation to the court thwarted the court's administration of salvor rights and its ability to act as guardian to ensure the artifacts would be properly handled. Thus, the alleged injury caused to RMST and its shareholders was a foreseeable, cognizable result of the predicate actions. The court **DENIES** the "Takeover Defendants"' motion to dismiss Claim 3.

### D. Defendants' Motions to Dismiss Claim 4

Plaintiff's Claim 4 seeks to recover damages for the allegedly wrongful denial of shareholders' voters' and dissenters' rights under Florida statutory law after the hostile takeover of RMST in November of 1999. Section 607.0902 of the Florida Statutes deals with control-share acquisitions.[48] The statute requires that "the vot-

---

**45.** According to the complaint, the only misrepresentations alleged are part of the obstruction of justice claim, namely that defendant Geller misrepresented to the court and to the public that RMST would not sell artifacts.

**46.** Reliance may still be relevant in such cases to the extent it helps establish proximate cause. Although the Fourth Circuit has required reliance where fraud is alleged to be the proximate cause of the injury, reliance is not invariably required to prove proximate cause. *See Chisolm,* 95 F.3d at 337 ("As we made clear in *Caviness v. Derand Resources*

*Corp.,* 983 F.2d 1295 (4th Cir.1993), a showing of reliance on the predicate act of fraud ensures the existence of a 'direct relation between the injury asserted and the injurious conduct alleged.' *Id.* at 1305.").

**47.** In fact, at present, it is not at all clear whether the defendants initiated any communications to RMST's shareholders after they overtook management in November of 1999.

**48.** Control-share acquisition, as used in the statute, means "the acquisition, directly or indirectly, by any person of ownership of, or the power to direct the exercise of voting

ing rights to be accorded the shares acquired in a control-share acquisition shall be presented to the next special or annual meeting of the shareholders." Fla. Stat. § 607.0902(7)(d). When control-shares are acquired, the majority of pre-existing, disinterested shares must vote a resolution regarding what power to give the control-shares. *See* Fla. Stat. § 607.0902(9). Unless otherwise provided in the corporation's articles of incorporation or bylaws, dissenters are entitled to receive the fair value of their shares. Fla. Stat. §§ 607.0902(11), 607.1302(1)(c).[49]

Plaintiff claims this procedure was not followed during the hostile takeover in 1999, and he seeks certification of a class action for damages caused by breach of fiduciary duty in preventing the shareholders from exercising their voting and dissenters' rights. The Geller defendants and defendant Marsh assert that plaintiff's proposed common law cause of action does not exist and that plaintiff was required to bring the claim in Florida state court as a derivative action pursuant to sections 607.1320(5) and (7) of the Florida Statutes, not as a class action in federal court.

Section 607.1320 explains the procedure for exercising dissenters' rights when shareholders have authorized the proposed action that creates dissenters' rights. The corporation is required to apprise all shareholders of their dissenters' rights, including how to assert these rights. Fla. Stat. § 607.1320(1). The specific sections relied on by defendants pertain to shareholders who exercise dissenters' rights and request the fair value of their shares. The statute provides that if the corporation fails to make a written offer, or if the shareholder fails to accept that offer, the corporation may bring a suit in the county in Florida where the registered office of the corporation is located. If the corporation fails to bring a suit, the dissenting shareholder may do so in the name of the corporation. *See* Fla. Stat. §§ 607.1320(5), (7).

Considering the current procedural posture of this case, the court cannot at this time adequately evaluate whether section 607.1320 applies to plaintiff's claims. No evidence before the court indicates that RMST's shareholders authorized or were even notified of the actions that allegedly created dissenters' rights as required by the statute. Accordingly, defendants' motions to dismiss Claim 4 are **DENIED** at this time.

### VI. *Summary*

The court **GRANTS** defendants Cretan and Banker's motion to dismiss for lack of

---

power with respect to, issued and outstanding control shares." Fla. Stat. § 607.0902(2)(a). Control shares are

> shares that, except for this section, would have voting power with respect to shares of an issuing public corporation that, when added to all other shares of the issuing public corporation owned by a person or in respect to which that person may exercise or direct the exercise of voting power, would entitle that person, immediately after acquisition of the shares, directly or indirectly, alone or as a part of a group, to exercise or direct the exercise of the voting power of the issuing public corporation *in the election of directors* . . . .

Fla. Stat. § 607.0902(1) (emphasis added). Dissenters are entitled to receive the fair value of their shares, which means a value not less than the highest price paid per share by the acquiring person in the control-share acquisition. Fla. Stat. § 607.0902(11).

**49.** Section 607.1301 of the Florida Statutes, in simplified form, provides that the term "fair value," with respect to a dissenter's shares, means the value of the shares as of the close of business on the day prior to the date on which the shareholders authorized the action taken, either by shareholders' vote or, if without a meeting, by written consent of the majority of outstanding shares. The section also provides for mergers, which is inapplicable here.

personal jurisdiction and **DISMISSES** these defendants from the instant action. As to defendants Geller, Couture, Harris, and Marsh, the court **DENIES** their motions to dismiss for lack of personal jurisdiction, which includes defendant Marsh's motion to dismiss for insufficient service of process.

The court **DENIES** defendants' motions to transfer venue of the case to another district. The court **DENIES** defendant Marsh's motion to dismiss Claim 5 for improper venue or to transfer the claim to another district. The court **DENIES** defendants' motion to dismiss the action for failure to make demand under Rule 23.1.

The court **GRANTS** defendant Marsh's motion to dismiss Claims 1 and 2 for failure to state a claim against him, but **DENIES** the Geller defendants' motion to dismiss Claim 2 for failure to state a claim upon which relief may be granted. The court **DENIES** the "Takeover Defendants' " motions to dismiss Claim 3 for failure to state a claim. Finally, the court **DENIES** defendants' motions to dismiss Claim 4 for failure to state a claim upon which relief may be granted.

The claims that remain against the defendants are as follows: Claim 1 for breaches of fiduciary duties remains against defendants Geller, Couture, Harris, and RMST; Claim 2 for injunctive relief remains against defendants Geller, Couture, and RMST; Claim 3 remains against defendants Geller, Harris, and Marsh for alleged violations of RICO; Claim 4, which deals with dissenters' rights under Florida law, remains against defendants Geller, Couture, Harris, Marsh, and RMST; and Claim 5 remains against defendant Marsh for allegedly violating the Securities Exchange Act.

The Clerk is **DIRECTED** to send a copy of this Opinion to G. Michael Harris, proceeding *pro se,* and to all counsel of record.

IT IS SO **ORDERED.***

## INDEX

I. Factual and Procedural History ........................................................ 375

II. Personal Jurisdiction .................................................................. 377
 A. Virginia's Long–Arm Statute ....................................................... 378
 1. Applicability of Statutory Language ............................................ 378
 2. Satisfaction of Due Process .................................................... 380
 a. Arnie Geller ............................................................. 382
 b. Gerald Couture .......................................................... 383
 c. Nick N. Cretan and Doug Banker ......................................... 383
 d. G. Michael Harris ....................................................... 384
 e. Joe Marsh ............................................................... 385
 B. Federal Statutes .................................................................. 386
 1. RICO Claim Against "Takeover Defendants" ..................................... 386
 2. Securities Exchange Act Claim Against Defendant Marsh ........................ 389

III. Motions Regarding Venue ............................................................. 390
 A. Defendants' Motions to Transfer Venue ............................................. 390
 B. Defendant Marsh's Motion to Dismiss Claim 5 for Improper Venue ................... 392

IV. Failure to Make Demand on RMST's Board of Directors .................................. 393

* For reference purposes, an Index is attached to this Opinion.

V. Failure to State a Claim Upon Which Relief May be Granted ....................394
 A. Defendant Marsh's Motion to Dismiss Claims 1 and 2 ........................394
 B. Geller Defendants' Motion to Dismiss Claim 2 ............................395
 C. "Takeover Defendants'" Motions to Dismiss Claim 3 ......................396
 1. Racketeering Activity .............................................397
 a. Mail Fraud ...............................................397
 b. Obstruction of Justice .....................................398
 2. Pattern of Racketeering Activity ....................................399
 3. Causation and Injury ..............................................400
 D. Defendants' Motions to Dismiss Claim 4 ................................401